UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICANS FOR FAIR TREATMENT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, et al.,<br><br>Defendants. | Civil Action No. 22-1183 (RCL) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND AND FACTS ...................................................................................... 1

    I.     The Postal Service COVID-19 Rapid Test Webform ........................................... 2

    II.    Plaintiff's FOIA Request and the Postal Service's Administrative Response ........ 4

        A.    Initial Determination ................................................................................ 4

        B.    Plaintiff's Administrative Appeal and the Agency's Subsequent Search ... 6

    III.   District Court Litigation ........................................................................................ 7

    IV.   The Postal Service's Searches After the Court's Opinion ..................................... 8

        A.    First Supplemental Search ........................................................................ 8

        B.    Second Supplemental Search .................................................................... 9

        C.    Third Supplemental Search ...................................................................... 11

LEGAL STANDARDS .................................................................................................. 12

    I.     Summary Judgment Under Rule 56 ..................................................................... 12

    II.    Summary Judgment Standard in FOIA Cases ..................................................... 13

ARGUMENT ................................................................................................................. 14

    I.     Individual Defendants Are Not Appropriate Defendants in this FOIA Matter. ... 14

    II.    The Postal Service Performed Reasonable Searches Pursuant to the Court's Order. ................................................................................................................... 15

    III.   Defendant Properly Applied FOIA Exemption 5. ............................................... 16

        A.    The Postal Service Explains Where It Applies the Deliberative Process Privilege and the Attorney-Client Privilege ............................................. 17

        B.    The Postal Service Appropriately Applied the Deliberative Process Privilege ................................................................................................. 18

        C.    The Postal Service Appropriately Applied the Attorney-Client Privilege 24

D.    The Postal Service Complied with FOIA's Foreseeable Harm Requirement ................................................................................................ 27

IV.    Defendant Complied with FOIA's Segregability Requirement ............................ 34

CONCLUSION ........................................................................................................................ 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramyan v. Dep't of Homeland Sec.*,
  6 F. Supp. 3d 57 (D.D.C. 2013) ........................................................................ 24

*Access Rep. v. Dep't of Just.*,
  926 F.2d 1192 (D.C. Cir. 1991) ........................................................................ 19

*Ams. for Fair Treatment v. U.S. Postal Serv.*,
  663 F. Supp. 3d 39 (D.D.C. 2023) ............................................................. passim

*Ancient Coin Collectors Guild v. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ......................................................................... 24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................... 12, 13

*Armstrong v. Exec. Off. of the President*,
  97 F.3d 575 (D.C. Cir. 1996) ........................................................................... 35

*Baldridge v. Shapiro*,
  455 U.S. 345 (1982) ........................................................................................ 16

*Brody v. Dep't of Just.*,
  No. 22-5043, 2023 WL 1511679 (D.C. Cir. Feb. 3, 2023) ............................... 30

*Campaign Legal Ctr. v. Dep't of Just.*,
  34 F.4th 14 (D.C. Cir. 2022) ............................................................................ 22

*Canning v. Dep't of Just.*,
  567 F. Supp. 2d 104 (D.D.C. 2008) ................................................................. 35

\*  *Cause of Action Inst. v. Dep't of Veterans Affs.*,
  Civ. A. No. 20-997(BAH), 2021 WL 1549668 (D.D.C. Apr. 20, 2021) ............... 32

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 12, 13

*Citizens for Resp. & Ethics in Wash. v. Dep't of Educ.*,
  905 F. Supp. 2d 161 (D.D.C. 2012) ................................................................. 23

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
  658 F. Supp. 2d 217 (D.D.C. 2009) ................................................................. 19

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*,
  161 F. Supp. 3d 120 (D.D.C. 2016), *modified*, 185 F. Supp. 3d 26 (D.D.C. 2016) ................. 23

*Customs & Int'l Trade Newsletter v. Customs & Border Prot.*,
  588 F. Supp. 2d 51 (D.D.C. 2008) ......................................................... 13

*De Sousa v. CIA*,
  239 F. Supp. 3d 179 (D.D.C. 2017) ........................................................ 35

*Dudman Commc'ns v. Dep't of Air Force*,
  815 F.2d 1565 (D.C. Cir. 1987) ........................................................ 19, 22

\* *Emuwa v. Dep't of Homeland Sec.*,
  113 F.4th 1009 (D.C. Cir. 2024) ........................................................... 29

\* *Energy Pol'y Advocs. v. Dep't of State*,
  Civ. A. No. 19-3307 (TNM), 2023 WL 4198200 (D.D.C. June 27, 2023) ........................ 34

*FBI v. Abramsom*,
  456 U.S. 615 (1982) .................................................................... 16

*Fisher v. United States*,
  425 U.S. 391 (1976) .................................................................... 25

*Frontier Found. v. Dep't of Just.*,
  739 F.3d 1 (D.C. Cir. 2014) ............................................................. 19

*Gellman v. Dep't of Homeland Sec.*,
  525 F. Supp. 3d 1 (D.D.C. 2021) ......................................................... 22

*Ginarte v. Mueller*,
  534 F. Supp. 2d 135 (D.D.C. 2008) ....................................................... 14

*Goodrich Corp. v. EPA*,
  593 F. Supp. 2d 184 (D.D.C. 2009) ....................................................... 20

*Hall & Assocs. v. EPA*,
  956 F.3d 621 (D.C. Cir. 2020) ........................................................... 25

*Hall & Assocs. v. EPA*,
  Civ. A. No. 18-1749, 2021 WL 1226668 (D.D.C. 2021) ...................................... 19

*In re Lindsey*,
  148 F.3d 1100 (D.C. Cir. 1998) .......................................................... 25

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ........................................................... 24

*In re Sealed Case*,
   737 F.2d 94 (D.C. Cir. 1984) ............................................................................... 25, 27

*Info. Corp. v. Dep't of Interior*,
   976 F.2d 1429 (D.C. Cir. 1992) .................................................................................. 24

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ................................................................................................... 16

*Johnson v. Exec. Off. for U.S. Attys.*,
   310 F.3d 771 (D.C. Cir. 2002) ................................................................................... 35

\* *Jud. Watch, Inc. v. Dep't of State*,
   557 F. Supp. 3d 52 (D.D.C. 2021) .............................................................................. 34

\* *Keeping Gov't Beholden, Inc. v. Dep't of Just.*,
   Civ. A. No. 17-1569 (FYP), 2021 WL 5918627 (D.D.C. Dec. 13, 2021) ............... 30

*Loving v. Dep't of Def.*, 550 F.3d 32 (D.C. Cir. 2008) ................................................ 35

\* *Machado Amadis v. Dep't of State*,
   971 F.3d 364 (D.C. Cir. 2020) ............................................................................ passim

\* *Mapother v. Dep't of Just.*,
   3 F.3d 1533 (D.C. Cir. 1993) ............................................................................... 20, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................... 13

*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) ................................................................................. 14

\* *Mead Data Cent., Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) .............................................................................. 24, 35

*Montrose Chemical Corp. v. Train*,
   491 F.2d 63 (D.C. Cir. 1974) ............................................................................... 19, 24

*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ................................................................................................... 18

*Nat'l Sec. Archive v. CIA*,
   752 F.3d 460 (D.C. Cir. 2014) .............................................................................. 18, 19

*Oglesby v. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) ..................................................................................... 15

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,
   330 F. Supp. 3d 373 (D.D.C. 2018) ........................................................................... 19

*Pub. Emps. for Env't Resp. v. EPA,*
   211 F. Supp. 3d 227 (D.D.C. 2016) ................................................................... 25, 26

\* *Public Employees for Environmental Responsibility v. Department of Homeland Sec.,*
   575 F. Supp. 3d 34 (D.D.C. 2021) ...................................................................... 30, 31

*Reinhard v. Dep't of Homeland Sec.,*
   Civ. A. No. 18-1449, 2019 WL 3037827 (D.D.C. 2019)........................................ 19

*Reliant Energy Power Generation, Inc. v. Fed. Energy Regul. Comm'n,*
   520 F. Supp. 2d 194 (D.D.C. 2007) ...................................................................... 20

\* *Reps. Comm. for Freedom of the Press v. Customs & Border Prot.,*
   567 F. Supp. 3d 97 (D.D.C. 2021) ...................................................................... 32, 34

\* *Reps. Comm. for Freedom of the Press v. FBI,*
   3 F.4th 350 (D.C. Cir. 2021) ................................................................................. 30

\* *Rosenberg v. Dep't of Def.,*
   442 F. Supp. 3d 240 (D.D.C. 2020) ...................................................................... 31

*Russell v. Dep't of Air Force,*
   682 F.2d 1045 (D.C. Cir. 1982) ............................................................................ 20

*Russell v. FBI,*
   Civ. A. No. 03-0611, 2004 WL 5574164 (D.D.C. Jan. 9, 2004) ............................ 13

*Skull Valley Band of Goshute Indians v. Kempthorne,*
   Civ. A. No. 04-0339(CKK), 2007 WL 915211 (D.D.C. 2007) .............................. 20

\* *Sussman v. U.S. Marshals Serv.,*
   494 F.3d 1106 (D.C. Cir. 2007) ............................................................................ 35

*Tao v. Freeh,*
   27 F.3d 635 (D.C. Cir. 1994) ................................................................................. 12

*Tax Analysts v. IRS,*
   117 F.3d 607 (D.C. Cir. 1997) .............................................................................. 27

\* *Tobias v. Dep't of Interior,*
   Civ. A. No. 22-167 (BAH), 2024 WL 894925 (D.D.C. Mar. 1, 2024)................... 31

*Upjohn Co. v. United States,*
   449 U.S. 383 (1981) ............................................................................................. 25

*Vaughn v. Rosen,*
   484 F.2d 820 (D.C. Cir. 1973) .............................................................................. 14

*ViroPharma Inc. v. Dep't of Health & Hum. Servs.*,
    839 F. Supp. 2d 184 (D.D.C. 2012) ....................................................................... 19

*Weisberg v. Dep't of Just.*,
    627 F.2d 365 (D.C. Cir. 1980) .............................................................................. 14

*Wheeler v. Dep't of Just.*,
    403 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................... 13, 14

**Statutes**

5 U.S.C. § 552 ............................................................................................ passim

5 U.S.C. § 552a(e)(3) ............................................................................... 2, 3, 31

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 12, 13

Defendants the United States Postal Service, Postmaster General Louis DeJoy, and General Counsel Thomas Marshall (the "Postal Service" or the "Agency") submit this memorandum in support of their Renewed Motion for Summary Judgment. Summary judgment should be entered for Defendants on all remaining claims pursuant to Federal Rule of Civil Procedure ("Rule") 56.

## INTRODUCTION

This case involves Plaintiff's Freedom of Information Act ("FOIA") claims based on requests for Postal Service records pertaining to a Privacy Act Statement posted on the Agency's website for COVID-19 tests delivered through the Postal Service.

First, the Agency conducted reasonable searches in the locations where responsive records were likely to be found as to both components of Plaintiff's request. As a result of its multiple searches, the Postal Service produced 519 pages of responsive records in part to Plaintiff. Plaintiff has indicated that it no longer challenges the Agency's search.

Second, the Agency properly withheld information under FOIA Exemptions 3, 5, and 6. Plaintiff does not challenge the Agency's withholdings under Exemptions 3 and 6. Thus, the only issue for this Court's consideration is the Agency's withholdings under the deliberative process and attorney-client communication privileges of Exemption 5. The Postal Service has adequately explained the bases for the invocation of that Exemption and the foreseeable harm if the redacted information were released. Thus, the Court should enter summary judgment in favor of Defendants as to the remaining FOIA claims.

## BACKGROUND AND FACTS

Defendants respectfully refer the Court to the March 23, 2023, Memorandum Opinion for the factual and procedural background of this case. *See Ams. for Fair Treatment v. U.S. Postal Serv.*, 663 F. Supp. 3d 39 (D.D.C. 2023). Defendants summarize the salient facts herein to support the current Renewed Motion for Summary Judgment.

I.     **The Postal Service COVID-19 Rapid Test Webform**

In January 2022, the Postal Service began to develop a webpage through which members of the American public could request COVID-19 rapid antigen tests. App'x 1, 3d. Supp. Decl. of Janine Castorina ("3d Supp. Castorina Decl.") ¶ 7.

All Postal Service webforms that involve the collection of personal information must undergo a privacy review, which the Postal Service Privacy and Records Management Office (the "Privacy Office") performs under the direction Chief Privacy and Records Management Officer Janine Castorina. 3d Supp. Castorina Decl. ¶ 8. When such reviews indicate the Postal Service must publish a statement pursuant to the Privacy Act, 5 U.S.C. § 552a(e)(3) ("Privacy Act Statement"), the Privacy Office drafts such a Statement. *Id.* The Privacy Act Statement informs individuals of the authority for collecting the requested information, the routine uses of collected information, and the effect of providing the information or the failure to do so. *Id.*

Accordingly, in the first week of January 2022, Postal Service employees Heather Dyer, Vice President of the Corporate Information Security Office (Chief Information Security Officer); Christopher Karpenko, Executive Director of Brand Marketing; and Kimberly Workinger, Digital Brand Marketing Manager, called Ms. Castorina to request legal advice to ensure that the COVID-19 test kit webform was compliant with the Privacy Act. 3d Supp. Catarina Decl. ¶ 9.

After discussing the website with Ms. Dyer, Mr. Karpenko, and Ms. Workinger, Ms. Castorina spoke with Christopher Gillespie (Privacy and Records Compliance Specialist) and Christopher Lind (Privacy and Records Manager) to prepare a Privacy Act Statement to display on the site. 3d Supp. Castorina Decl. ¶ 10. Following these discussions, Messrs. Gillespie and Lind drafted a Privacy Act Statement for Ms. Castorina's review. *Id.* Drafts of the Privacy Act Statement were circulated exclusively via email by the three staff members. Decl. of Janine Castorina ("1st Castorina Decl.") ¶ 16, ECF No. 14-2.

During this period, the Corporate Law section of the Law Department also conducted its standard review of advertising content, broadly defined. 3d Supp. Castorina Decl. ¶ 11. Contributors to this "Ad Review" included Maria Votsch, Chief Counsel, Business and Finance Law, and Karren Vance, an attorney in Business and Finance Law. *Id.* The COVID-19 test kit webform was first published at https://special.usps.com/testkits on January 18, 2022. *Id.* ¶ 12 (full text of original Privacy Act Statement).

On January 19, 2022, a staff member for the office of U.S. Senator Ron Wyden emailed the Privacy Office's email address, privacy@usps.gov, inquiring whether the Privacy Act Statement, which permitted information disclosure "for law enforcement purposes," could result in personal information being shared with U.S. government immigration agencies. 3d Supp. Castorina Decl. ¶ 13. Postal Service Vice President of Corporate Communications Jeffery Adams then emailed with Subhan Cheema of the White House's COVID-19 Response Team regarding the Privacy Act Statement. *Id.* ¶ 14. Between January 19 and January 27, 2022, several Postal Service employees, including Ms. Castorina and General Counsel Thomas Marshall, corresponded regarding revisions to the Privacy Act Statement. *Id.* ¶ 15.

On January 28, 2022, the COVID-19 test kit webform was updated to include a revised Privacy Act Statement. 3d Supp. Castorina. Decl. ¶ 16 (full text of revised Privacy Act Statement). The Postal Service did not revise the Privacy Act Statement appearing on the COVID-19 test kit webform at any other time between January 28, 2022, and April 28, 2022, the date the present lawsuit was filed. *Id.* ¶ 17.

## II.     **Plaintiff's FOIA Request and the Postal Service's Administrative Response**

### A.     **Initial Determination**

By letter dated February 7, 2022, a representative of Plaintiff Americans for Fair Treatment

submitted a FOIA request for the following:

> (1)     All records concerning the "Privacy Act Statement" contained on USPS's
> webform through which members of the public may order rapid antigen
> COVID-19 tests (https://special.usps.com/testkits). The records requested
> include, but are not limited to, those that reflect USPS's decision to depart
> from using its default "Privacy Act notice" that is "for personal information
> collected online"(which is published at https://about.usps.com/who/legal
> /privacypolicy/full-privacy-policy.htm) and instead to use a "Privacy Act
> Statement" that says the Postal Service may, without consent, disclose
> information it obtains about the public through the COVID-19 test webform
> to "labor organizations as required by applicable law."

> (2)     All records concerning the Postal Service's disclosure to any labor
> organization of information it obtained through the COVID-19 test
> webform.

Compl. Ex. A, ECF No. 1.

As to Item No. 1, the Postal Service construed the request as seeking records related to the

decision to "depart" from the Privacy Policy on USPS.com in preparing the Privacy Act Statement

appearing on the COVID-19 test kit webpage. 3d Supp. Castorina Decl. ¶ 20. The Postal Service

initially determined that no such decision was made, because they are unrelated: The Privacy

Policy arises from the Postal Service's voluntary compliance with the E-Government Act of 2002,

while the Privacy Act Statement arises from the Privacy Act of 1974. *Id*. The Privacy Policy

webpage does include an example of a Privacy Act Statement; however, the Postal Service

prepares specific Privacy Act Statements for all instances (on- and offline) in which it collects

personally identifiable information, and the Postal Service does not collect such information on

the Privacy Policy webpage. *Id*. Here, there was not a decision to depart from either the Privacy

Policy webpage or the example Privacy Act Statement appearing on that page in drafting the

Privacy Act Statement for the COVID-19 test kit webform. *Id.* As a result of this construction, the Postal Service determined there were no records responsive to Item No. 1 of the request. *Id.*

As to Item No. 2, Ray Donahue, Managing Counsel of Labor Law, conducted the Postal Service's search for responsive records. 3d Supp. Castorina Decl. ¶ 21. Mr. Donahue oversees all Postal Service legal matters concerning labor organizations. *Id*. Accordingly, Mr. Donahue reviewed his team's shared drive for materials concerning a disclosure to a labor organization by browsing the team's files related to information disclosures. *Id*. Mr. Donahue does not keep paper files, and his search did not return any responsive records. *Id*.

Separately, the Postal Service's Labor Relations Department directly communicates with union management and responds to union inquiries. 3d Supp. Castorina Decl. ¶ 22. Labor Relations is divided into four sections, with one section for each of the labor unions—the American Postal Workers Union, the National Association of Letter Carriers, the National Postal Mail Handlers Union, and the National Rural Letter Carrier's Association. *Id*. Each section has a department head who tracks union requests, logs each union request, and ensures that the requests are responded to, as required by law. *Id*. The individuals maintain spreadsheets documenting requests from their respective unions. *Id*. At Mr. Donahue's request, the department heads reviewed all union requests for the period between January 2022 and the date of Plaintiff's FOIA request to determine whether their respective unions requested test kit information. *Id*. During this process, the relevant individuals reviewed all union information requests without search terms. *Id.* However, the searches revealed no responsive records. *Id*. In other words, no union requested information gathered on the COVID-19 test kit webpage, and the Postal Service provided no such information to any labor union. *Id*.

On February 5, 2022, the Postal Service issued its determination that there were no records responsive to either item of Plaintiff's request. 3d Supp. Castorina Decl. ¶ 23.

## B.    Plaintiff's Administrative Appeal and the Agency's Subsequent Search

On March 15, 2022, Plaintiff administratively appealed the Postal Service's no-records determination. 3d Supp. Castorina Decl. ¶ 24. The Postal Service conducted another search. *Id.* ¶ 25.

As to Item No. 1, the Postal Service's Information Catalog Program (the "Catalog Program"), the component with access to the Postal Service's email repository for the purposes of conducting email searches, performed the first step of the search. 3d Supp. Castorina Decl. ¶ 26. In response to Item No. 1, the Privacy Office requested that the Catalog Program search the email accounts of six Postal Service employees for (1) the term "Privacy Statement" or (2) the full text of the Privacy Act Statement ultimately used on the COVID-19 rapid test webform (*i.e.*, the full Privacy Act Statement enclosed in quotation marks). *Id.* The six email addresses included three belonging to employees in the Privacy Office—Ms. Castorina, Mr. Gillespie, and Mr. Lind. *Id.* The other three email addresses belonged to internal clients—Ms. Dyer, Mr. Karpenko, and Ms. Workinger. *Id.* The Catalog Program searched these six email accounts because of the involvement of these individuals in preparing the COVID-19 rapid test webform and the accompanying Privacy Act Statement. *Id.* The Catalog Program did not use a date range for this search. *Id.* However, the search returned no records. *Id.*

When the Catalog Program's search returned no records, Privacy Office personnel—Ms. Castorina, Mr. Lind, and Mr. Gillespie—browsed their email archives and determined that the search terms "Privacy Act Statement" and "810" (the identifier corresponding to the Privacy Act System of Records for USPS.com registration information) might return responsive records. Castorina Decl. ¶ 27. That search revealed nine pages of responsive records. *Id.*

On April 6, 2022, the Postal Service issued its decision on administrative appeal, producing

nine pages in part in response to Item No. 1 and determining there were no responsive records as

to Item No. 2. Castorina Decl. ¶ 28.

## III.    District Court Litigation

On April 28, 2022, Plaintiff filed suit in this Court against the Postal Service, as well as the

Postmaster General, and the Postal Service's General Counsel in their official capacities. Compl.,

ECF No. 1. The complaint asserted four counts: (I) violation of FOIA by withholding responsive,

non-exempt records, *id.* at 54-60; (II) violation of FOIA by failing to conduct an adequate search,

*id.* at 61-68; (III) arbitrary and capricious or contrary-to-law action in violation of the APA by

failing to allow an appeal to the head of the agency himself, *id*. at 69-75; and (IV) ultra vires action

by failing to allow an appeal to the head of the agency himself, *id.* at 76-80.

On March 23, 2023, the Court issued its Memorandum Opinion and Order. Mem. Op. &

Order, ECF Nos. 30, 31 (also available at *Ams. for Fair Treatment v. U.S. Postal Serv.*, 663 F.

Supp. 3d 39 (D.D.C. 2023)). The Court dismissed Counts III and IV of the Complaint and granted

in part and denied in part the Postal Service's motion for summary judgment as to Counts I and II.

*Id.*

As to the search, the Court determined that the Postal Service did not provide an adequate

explanation. *Ams. for Fair Treatment*, 663 F. Supp. 3d at 52-55. First, the Court determined that

the Postal Service's supporting affidavits did not adequately identify its search terms as to both

items of the request or "the type of search performed" as to Item No. 2. *Id.* at 52-55, 62-63. Second,

the Court concluded the Postal Service should have searched the records of three employees "who

had some interaction about the Privacy Act Statement with the attorneys who were drafting it"—

namely, Ms. Dyer, Mr. Karpenko, and Ms. Workinger. *Id.* at 55, 62-63. Third, the Court found the

Postal Service did not adequately explain why it did not search for documents related to a revision

of the Privacy Act Statement that occurred before the Postal Service conducted a new search at the administrative appeal stage. *Id* at 54, 62-63.

As to the withholdings, the Court held the Postal Service did not adequately explain its Exemption 5 withholdings, regarding attorney-client privilege in part, and did not carry its burden to explain the foreseeable harm of disclosure with respect to any of its Exemption 5 withholdings. *Ams. for Fair Treatment*, 663 F. Supp. 3d at 56-61. The Court did not consider segregability. *Id.* at 56.

Accordingly, the Court ordered the Postal Service (1) to conduct an additional search and give an adequate justification for that search in a manner consistent with its Memorandum Opinion; and (2) to file a new *Vaughn* Index and supporting affidavit explaining the propriety of its Exemption 5 withholdings. *Ams. for Fair Treatment*, 663 F. Supp. 3d at 62-63.

## IV.   The Postal Service's Searches After the Court's Opinion

In response to the Court's Order (ECF No. 31), the Postal Service conducted three supplemental searches as described below. 3d Supp. Castorina Decl. ¶¶ 30-51.

### A.   First Supplemental Search

The Postal Service conducted its first supplemental search and released forty-one pages in part to Plaintiff. 3d Supp. Castorina Decl. ¶¶ 30-36. As part of this search, the Postal Service searched the records of Ms. Dyer, Mr. Karpenko, and Ms. Workinger. 3d Supp. Castorina Decl. *Id*. ¶¶ 31-32. Through the Catalog Program, the Postal Service searched each of these individuals' email archives using the same search terms as returned the initial nine pages of responsive records—"Privacy Act Statement" and "810." *Id.* ¶ 32. The Postal Service located fourteen additional pages of responsive records. *Id*.

Next, the Postal Service conducted an additional search for any records related to a revision of the Privacy Act Statement. 3d Supp. Castorina Decl. ¶¶ 33-45. To locate records relevant to this

revision, Mr. Gillespie, Mr. Lind, and Ms. Castorina reviewed their email archives from January 25, 2022, to January 27, 2022, the date range for when the communications occurred about how to respond to the inquiry from Senator Wyden's Office. *Id.* ¶ 35. In doing so, they identified the terms "Privacy Concern" and "Test Kit Web Info" as appearing in responsive communications. *Id.* Accordingly, the Postal Service conducted a Catalog search using those two search terms in the email archives of Ms. Castorina, Mr. Lind, Mr. Gillespie, Ms. Dyer, Mr. Karpenko, and Ms. Workinger, along with Mr. Marshall, Peter Pastre (Vice President of Government Relations), and Jeffery Adams (Vice President of Corporate Communications), who also appeared on these emails. *Id.* The search criteria used for this search differed from the prior searches because the discussion concerning the revision occurred separately from the creation of the Privacy Act Statement and occurred during a different timeframe. *Id.*

On March 8, 2024, Defendants filed its renewed motion for summary judgment, ECF No. 60, and a corrected motion for summary judgment on July 31, 2024, ECF No. 75. Plaintiff thereafter notified Defendants that it believed their production was deficient, so the parties met and conferred on the Postal Service's productions to eliminate or narrow those issues for the Court's attention. Jt. Status Rep., ECF No. 79.

### B.    Second Supplemental Search

Defendants conducted a second supplemental search and released 465 pages in part to Plaintiff. 3d Supp. Castorina Decl. ¶¶ 37-42. This search used a date range of January 1, 2022, to April 6, 2022 (the date of the Postal Service's administrative appeal decision), and five sets of terms and connectors:

a. Subhan OR Wyden OR [the last name of the member of the public who contacted the Postal Service regarding concerns about the Privacy Act Statement]

b. 810

c. "your information will be used to provide Covid-19 testing kits"

d. "Privacy Statement updated" OR "new Privacy Statement"

e. ("Project T" OR "test kits" OR "testing kits") AND ("privacy policy" OR "Privacy Statement" OR "Privacy Act Statement")

*Id.* ¶ 39. "Subhan" is the first name of the White House staff member with whom Mr. Adams corresponded concerning revisions to the Privacy Act Statement. 3d Supp. Castorina Decl. ¶ 39 n.6. "810" is the number of the Privacy Act System of Records containing records related to USPS.com (including the COVID-19 test kit webpage). *Id.* at n.7. "Project T" was the internal label for the development of the COVID-19 test kit webpage. *Id.* at n.10. And the other phrases and terms in the above list came from the Privacy Act Statement appearing on the COVID-19 test kit website or were in email conversations that the Postal Service has already identified as responsive. *Id.* at nn.8, 9.

For this second supplemental search, the Postal Service expanded the number of custodians at Plaintiff's request. 3d Supp. Castorina Decl. ¶ 40. Specifically, this second supplemental search extended to the email records of every person who sent, received, or was copied on any of the emails previously produced to Plaintiff and any other employee mentioned in any of the Postal Service's filings, although these individuals were not likely to have records not possessed by the custodians whose records had already been searched. *Id.* The search accordingly encompassed the records of twenty-eight individuals, including the nine custodians whose records had already been searched (Ms. Castorina, Mr. Lind, Mr. Gillespie, Ms. Dyer, Ms. Workinger, Mr. Karpenko, Mr. Marshall, Mr. Pastre, and Mr. Adams) and nineteen additional custodians requested

by Plaintiff (Mr. Donahue; Ms. Votsch; Postmaster General Louis DeJoy and Chief of Staff Heather Clarke; Chief Postal Inspector Gary Barksdale; Vice President of Customer Experience Marc McCrery; Government Relations Representative Cory Brown; Manager of Customer Contact Internal and Contracts David Colon; and contractors Solana Lazarte, Mark Ross, Elliott Rosner, Andrew Hung, Brittnee Hodges, Joseph Loong, Maya Lilley, Gabriel Freytes, Margaret Claire Dykes, Mark Kosnoff, and Shilpa Chukka). *Id*.

   As a result of this second supplemental search, the Postal Service released 465 pages in part to Plaintiff. 3d Supp. Castorina Decl. ¶ 41. The Court then ordered Defendants to re-file their motion for summary judgment on December 12, 2024. Order, ECF No. 82.

### C.    Third Supplemental Search

   Before filing this motion, the parties conferred again, and Defendants conducted a third supplemental search and released four pages in part to Plaintiff. 3d Supp. Castorina Decl. ¶¶ 43-35. After the Postal Service produced the records retrieved via the second supplemental search, Plaintiff requested that the Postal Service search the records of additional custodians, highlighting three custodians as particularly relevant—Ms. Vance, Chief Counsel of Ethics and Legal Compliance Ruth Stevenson, and the general privacy@usps.gov email address. *Id.* ¶ 43.

   In a gesture of good faith and to ensure that all responsive records were gathered from the privacy@usps.gov email account (which is not specifically assigned to any Postal Service employee), the Postal Service conducted a third supplemental search for responsive records. 3d Supp. Castorina Decl. ¶ 44. This search, performed by the Catalog Program, encompassed the records of Ms. Vance, Ms. Stevenson, and the privacy@usps.gov account, and it used the following terms and connectors: "your information will be used to provide COVID-19 testing kits" OR "privacy statement updated" OR "new privacy statement" OR (("Project T" OR "test kits" OR

"testing kits") AND ("privacy policy" OR "privacy statement" OR "privacy act statement")). *Id.*
¶ 44. The date range of the search was January 1, 2022, to April 6, 2022. *Id.*

No additional responsive material was located in Ms. Vance or Ms. Stevenson's records;
however, the search returned four pages of responsive records located in the privacy@usps.gov
inbox. 3d Supp. Castorina Decl. ¶ 45.

In sum, a total of 519 pages of responsive records have been released in part to Plaintiff.
*Id.* ¶¶ 18-45. Also pursuant to the Court's March 2023 Order (ECF No. 31), the Postal Service
submits the attached *Vaughn* Index showing that it withheld certain information pursuant to
Exemptions 3, 5, and 6. 3d Supp. Castorina Decl. Ex. 1. The parties met and conferred, and counsel
for Plaintiff has represented to the undersigned counsel for Defendants via email that it does not
dispute the Postal Service's search, or the Postal Service's application of Exemptions 3 and 6.
App'x 2 at 2-3,[1] Dec. 6, 2024, Emails. As a result, the only issue for this Court's consideration is
whether the Postal Service appropriately justified the application of Exemption 5.

**LEGAL STANDARDS**

I.    **Summary Judgment Under Rule 56**

Summary judgment is appropriate when the pleadings and evidence show that "there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

The party seeking summary judgment must demonstrate the absence of a genuine issue of
material fact. *See Celotex*, 477 U.S. at 248. A genuine issue of material fact is one that "might
affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. In determining

---

[1]    All citations are to the ECF-generated page numbers.

whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis omitted). The moving party may discharge this burden by "'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 332. Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings and must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. Summary judgment is thus due if the non-moving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Id.*

## II.    <u>**Summary Judgment Standard in FOIA Cases**</u>

Courts generally and appropriately resolve FOIA cases on motions for summary judgment. *Customs & Int'l Trade Newsletter v. Customs & Border Prot.*, 588 F. Supp. 2d 51, 54 (D.D.C. 2008); *Russell v. FBI*, Civ. A. No. 03-0611, 2004 WL 5574164, at *2 (D.D.C. Jan. 9, 2004); *see also Wheeler v. Dep't of Just.*, 403 F. Supp. 2d 1, 5 (D.D.C. 2005) ("Summary judgment is the routine vehicle by which most FOIA actions are resolved."). Summary judgment should be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any fact that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248.

An agency is entitled to summary judgment in a FOIA case if it demonstrates: (1) that it has conducted an adequate search for responsive records and (2) each responsive record that it has

located either has been produced to the plaintiff or is exempt from disclosure. *See Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980). To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations. *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820, 826-27 (D.C. Cir. 1973); *Wheeler*, 403 F. Supp. 2d at 6.

## ARGUMENT

The Postal Service is entitled to summary judgment because it has performed adequate searches reasonably designed to return responsive records and produced to Plaintiff any responsive, non-exempt records, an issue Plaintiff no longer contests. The Agency has withheld from its productions only exempt information the release of which would foreseeably harm an interest protected by the FOIA. Finally, the Agency has satisfied FOIA's segregability requirement.

The Postal Service has met each of the Court's prior requirements by (1) conducting the supplemental search, (2) explaining in greater detail the search terms and the nature of the search performed in response to both items of Plaintiff's FOIA request, and (3) supplying additional information concerning the application of attorney-client privilege, the deliberative-process privilege, and the foreseeability of harm in relation to the disclosure of information withheld under Exemption 5.

Accordingly, summary judgment in the Postal Service's favor is appropriate.

## I.    Individual Defendants Are Not Appropriate Defendants in this FOIA Matter.

As an initial matter, summary judgment should be granted for the individual defendants in this matter. The only issue left for this matter are the FOIA claims in Counts I and II. *See Ams. for Fair Treatment*, 663 F. Supp. 3d at 51-52. The only proper Defendant in a FOIA suit is the agency itself. *See, e.g.*, *Ginarte v. Mueller*, 534 F. Supp. 2d 135, 136 (D.D.C. 2008) ("It is well established

14

by now that individual federal employees are not subject to suit under FOIA." (cleaned up)). Therefore, summary judgment is appropriate for Defendants Postmaster General Louis DeJoy and General Counsel Thomas Marshall to the extent these parties are still Defendants in this action.

## II.    **The Postal Service Performed Reasonable Searches Pursuant to the Court's Order.**

Although Plaintiff no longer disputes the adequacy of the Postal Service's search for responsive records, the Postal Service nonetheless addresses its search because of the Court's Order requiring the Agency to conduct a supplemental search and explain the bases for its previous searches. *See Ams. for Fair Treatment*, 663 F. Supp. 3d at 62-63.

As the Court indicated in its Opinion, the Postal Service previously did not explain the adequacy of its search "in three ways and three ways only." *Ams. for Fair Treatment*, 663 F. Supp. 3d at 55. First, the supporting affidavits did not "set[] forth the search terms" used for either item of the request or "the type of search performed" with respect to the second item in Plaintiff's request. *Id.* (citing *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Second, the Postal Service did not search the records of three employees who had some interaction about the Privacy Act Statement with the attorneys who were drafting it. *Id.* Third, the Postal Service did not explain why it did not search for certain records that might have existed at the time of its search, specifically related to a revision of the Privacy Act Statement. *Id.*

As described above, the Postal Service has now addressed each of these matters. First, the Postal Service has described the search terms used with respect to both items of the request and the type of search performed as to Item No. 2 that it performed prior to the Court's Opinion. *See* 3d Supp. Castorina Decl. ¶¶ 20-29; 48. The Third Supplemental Castorina Declaration also explains the search terms and methods that the Postal Service employed as to the first, second, and third supplemental searches performed after the Court's Opinion. *Id.* ¶¶ 30-45, 48. Second, the Postal Service has now conducted a thorough review of the records of Ms. Workinger, Mr.

Karpenko, and Ms. Dyer, in addition to numerous other records custodians. *Id.* ¶¶ 30-45, 49. Third, the Postal Service has searched for records related to the revision of the Privacy Act Statement that occurred on January 28, 2022, and no other revision occurred.  *Id.* ¶¶ 30-45, 50-51. Plaintiff has indicated that it does not raise any challenge to the Postal Service's searches.

Based on the Third Supplemental Castorina Declaration, the Court should find the Postal Service complied with its order by conducting an adequate and reasonable search for records under the FOIA and explaining those searches.

## III.    Defendant Properly Applied FOIA Exemption 5.

FOIA "expressly recognizes . . . that public disclosure is not always in the public interest and consequently provides that agency records may be withheld from disclosure under any one of the nine exemptions defined in 5 U.S.C. § 552(b)." *Baldridge v. Shapiro*, 455 U.S. 345, 352 (1982). The inclusion of these exemptions in the FOIA reflects Congress's intention to achieve "a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. 89 - 1497, 89th Cong., 2d Sess. 6 (1966)). While these exemptions are to be "narrowly construed," *FBI v. Abramsom,* 456 U.S. 615, 630 (1982), courts must not fail to give "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152.

The locations of the withheld information in this case are identified on a new *Vaughn* index by Bates number, document description, material withheld, and justification. 3d Supp. Castorina Decl., Ex. 1 (*Vaughn* Index). Plaintiff has indicated that it does not dispute the Postal Service's application of FOIA Exemption 3, 5 U.S.C. § 552(b)(3), or Exemption 6, *id.* § 552(b)(6). App'x 2 at 2, Emails. The remainder of the information redacted by the Postal Service has been withheld pursuant to FOIA Exemption 5, *id.* § 552(b)(5). 3d Supp. Castorina Decl., Ex. 1 (*Vaughn* Index).

As explained below and as detailed in the accompanying Third Castorina Declaration, the Postal Service properly relied on FOIA Exemption 5 to withhold responsive material that is protected under the deliberative process privilege and the attorney-client privilege.

### A. The Postal Service Explains Where It Applies the Deliberative Process Privilege and the Attorney-Client Privilege.

In its March 23, 2023, Opinion, the Court held that the Postal Service "failed in this case to delineate its deliberative process privilege withholdings from its attorney-client privilege withholdings" and ordered the Agency to produce a new *Vaughn* index and supporting affidavit that more adequately explains its withholdings. *Ams. for Fair Treatment*, 663 F. Supp. 3d at 57, 63. Specifically, the Court ordered the Postal Service "to make clear in those new materials which privilege applies to which redactions." *Id.*

The Postal Service complies with the Court's directives with the Third Supplemental Castorina Declaration and attached *Vaughn* Index. The Third Castorina Declaration states that the deliberative process privilege applies in each instance where the Postal Service has asserted Exemption 5, in both the initial production (USPS_1–USPS_9) and the supplemental productions (USPS_10–USPS_519). 3d Supp. Castorina Decl. ¶ 54. The texts of certain produced emails have been redacted under Exemption 5 pursuant to both the deliberative process privilege and the attorney-client privilege; to the extent these redactions depend on the deliberative process privilege, they protect internal communications amongst the Postal Service's legal counsel and internal clients, including Ms. Castorina; Thomas Marshall, Executive Vice President and General Counsel; Maria Votsch and Karren Vance of Business and Finance Law; Peter Pastre, Vice President of Government Relations; Jeffery Adams, Vice President of Corporate Communications; Kimberly Workinger, Manager of Digital Marketing; Heather Dyer, Chief Information and

17

Security Officer and Vice President; Gary Barksdale, Chief Postal Inspector; Mary Ann Simpson and Cory Brown of the Government Relations office; and numerous contractors. *Id.*

### B.    The Postal Service Appropriately Applied the Deliberative Process Privilege

The Postal Service appropriately withheld deliberative and pre-decisional information. This information reflects the give-and-take process among numerous officials and components of the Postal Service in (1) developing the COVID-19 test kit webform, including the Privacy Act Statement appearing on that page, (2) preparing an external statement regarding the Privacy Act Statement, and (3) revising the Privacy Act Statement. 3d Supp. Castorina Decl. ¶¶ 55-59.

When Congress enacted FOIA Exemption 5 and protected "inter-agency or intra-agency memorandums or letters that would not be available" in litigation with an agency, 5 U.S.C. § 552(b)(5), it had the deliberative process privilege "specifically in mind." *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). The privilege "protect[s] the 'decision making processes of government agencies'" by withholding "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* The privilege is intended to "encourage frank and candid debate." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014). "[P]rivileges that are intended to facilitate candid communication, such as the deliberative process privilege, generally do not have an expiration date" because "the speaker or writer must have some strong assurance at the time of the communication that the communication will remain confidential." *Id.*

To fall within the scope of the privilege, records must be predecisional and deliberative. "'Documents are predecisional if they are generated before the adoption of an agency policy, and deliberative if they reflect the give-and-take of the consultative process.'" *Machado Amadis v. Dep't of State,* 971 F.3d 364, 370 (D.C. Cir. 2020) (citations omitted). To be predecisional, the communication "must have occurred before any final agency decision on the relevant matter."

*Nat'l Sec. Archive*, 752 F.3d at 463; *see also Citizens for Resp. & Ethics in Wash.* ("CREW") *v. Dep't of Just.*, 658 F. Supp. 2d 217, 233-34 (D.D.C. 2009) (concluding that the deliberative process privilege can apply to postdecisional documents recounting the predecisional process).

Meanwhile, to qualify as deliberative, the communication must be "intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive*, 752 F.3d at 463; *see also Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 4 (D.C. Cir. 2014) (explaining that the privilege protects "papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be"). In practice, the requirements that a record be both predecisional and deliberative "'tend to merge.'" *Hall & Assocs. v. EPA,* Civ. A. No. 18-1749, 2021 WL 1226668, at 5 (D.D.C. 2021) (quoting *Access Rep. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991)).

Application of the requirements recognizes that "Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies." *ViroPharma Inc. v. Dep't of Health & Hum. Servs.*, 839 F. Supp. 2d 184, 193 (D.D.C. 2012) (emphasis omitted; citing *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 71 (D.C. Cir. 1974)).

> Courts "focus less on the nature of the materials sought and more on the effect of the materials' release: the key question in [such] cases [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 382 (D.D.C. 2018) (citing *Dudman Commc'ns v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). Indeed, the privilege "'protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency.'" *Reinhard v. Dep't of Homeland Sec.*, Civ. A. No. 18-1449, 2019 WL 3037827, at 6

(D.D.C. 2019) (citing *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982);

*Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (stating that privilege "serves to

protect the deliberative process itself, not merely documents containing deliberative material"));

*see also, e.g., Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 189-90 (D.D.C. 2009) (concluding

that a draft groundwater flow model was protected because it reflected "evolving iterations of the

Model's inputs and calibration reflect the opinions of the staff" even though the data plugged into

the model itself was purely factual and noting that "the selection and calibration of data is part of

the deliberative process to which Exemption 5 applies."); *Reliant Energy Power Generation, Inc.*

*v. Fed. Energy Regul. Comm'n,* 520 F. Supp. 2d 194, 205-06 (D.D.C. 2007) (concluding that

spreadsheets reflecting data were protected because they were used by agency employees in

writing reports, rendering them part of the deliberative process, even though the spreadsheets alone

were factual rather than deliberative); *Skull Valley Band of Goshute Indians v. Kempthorne,* Civ.

A. No. 04-0339 (CKK), 2007 WL 915211, at *14 (D.D.C. 2007) (stating that "the drafting process

is itself deliberative in nature, [as] the disclosure of draft documents could 'expose to public view

the deliberative process of an agency").

Here, the Postal Service has withheld from the responsive records information regarding a

series of deliberative processes. First, several communications pre-date the publication of the

COVID-19 test kit webform as a whole; these communications concern deliberations concerning

the contents of the webform, the Postal Service's general legal review of the webform, and

preparation of the Privacy Act Statement to appear on that page. 3d Supp. Castorina Decl. ¶ 55 &

n.11. After the webform was published, Postal Service officials deliberated over a statement

concerning its compliance with the Privacy Act, to be shared with Senator Wyden's office. *Id.* ¶ 55

& n.12. Finally, internal counsel engaged in discussions concerning a revision to the Privacy Act Statement meant to address concerns received by the Agency. *Id*. ¶ 55 & n.13.

The responsive communications related to the initial development of the COVID-19 test kit webform were deliberative in that they concerned the publication of a webpage that would draw significant traffic, as the American public requested the tests made available by the White House. 3d Supp. Castorina Decl. ¶¶ 56-57. This project involved contributions from a wide range of personnel within the Postal Service, including employees in Government Relations, Corporate Communications, the Corporate Information Security Office, Brand Marketing, the Law Department, and other agency components. *Id*. ¶ 57. These individuals made contributions in developing the final webform offered by the Postal Service. More specifically, many responsive communications concern the Privacy Act Statement appearing on that page. *Id*. These communications were deliberative in that they reflected the input of various members of the Law Department in working out the proper language to comply with the Privacy Act (and appropriately inform users of the matters set forth under the Privacy Act, including concerning the "routine uses" applicable to the COVID-19 test kit webform). *Id*.

Communications concerning the preparation of the Postal Service's response to Senator Wyden's office were also deliberative. 3d Supp. Castorina Decl. ¶ 58. While the statement itself is not subject to the deliberative process privilege (and, accordingly, has not been redacted), communications regarding earlier drafts were important in facilitating development of the Postal Service's ultimate response. *Id*. ¶ 58. Furthermore, this response reflected recommendations and contributions from several members of Postal Service management, including the Vice Presidents of Corporate Communications and Government Relations, the General Counsel, and the Chief Postal Inspector, and it ultimately traveled up the chain of command to the Postmaster General.

*Id*. These contributions helped the Postal Service to clearly explain its Privacy Act compliance efforts, a particularly important issue given the large volume of test kit requests the Postal Service expected to receive. *Id*.

Finally, communications regarding the revision to the Postal Service's Privacy Act Statement occurring on January 28, 2022, were also deliberative. 3d Supp. Castorina Decl. ¶ 59. This revision related to the same inquiries regarding specific information-disclosure concerns, and Ms. Castorina worked with Mr. Marshall to ensure that the Privacy Act Statement was revised in a manner that addressed these concerns while continuing to comply with the Postal Service's disclosure obligations. *Id*. These communications reflected the Law Department's thinking in the process of clarifying the Postal Service's policy as a matter of Privacy Act compliance. *Id*. In doing so, they also reflected the Law Department's thinking with respect to the specific inquiries at issue—namely, contexts in which disclosures to law enforcement authorities (and, specifically, Immigration and Customs Enforcement) might be required. *Id*.

Such material is protected as reflecting an agency's deliberations. *See Dudman Commnc'ns*, 815 F.2d at 1568 (instructing that the deliberative process privilege protects against "the disclosure of editorial judgments—for example, decisions to insert or delete material or to change a draft's focus or emphasis"); *Campaign Legal Ctr. v. Dep't of Just.*, 34 F.4th 14, 24 (D.C. Cir. 2022) (holding that a draft letter and related email communications were deliberative because 'they reflect the give-and-take of the consultative process' underlying the formulation of the [] Letter and its proposed policy justifications."); *Gellman v. Dep't of Homeland Sec.*, 525 F. Supp. 3d 1, 7 (D.D.C. 2021) (concluding that two sentences in an email were properly redacted as "those two sentences are deliberative (because they made a recommendation as part of internal agency deliberations about filling a personnel need) and predecisional (because they were written by a

junior staffer before the agency made any decision on the matter)."); *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 131 (D.D.C. 2016), *modified*, 185 F. Supp. 3d 26 (D.D.C. 2016) (concluding that the agency met its burden by identifying the staff who commented and reviewed drafts about application and interpretation of agency guidelines).

A further indication that the emails concerning the COVID-19 test kit web form, Privacy Act compliance, and both versions of the Privacy Act Statement are protected under the deliberative process privilege is that they are between various levels of subordinate and superior officials as they discussed draft material, prior to the Postal Service's approval of final versions. Specifically, as reflected in these materials, Mr. Karpenko and Ms. Workinger supervised the technical processes of publishing and updating the COVID-19 test kit webform. 3d Supp. Castorina Decl. ¶ 35. Similarly, in preparing the Privacy Act Statement, Mr. Gillespie and Mr. Lind prepared a draft of the Statement, which was subject to the review and approval by Ms. Castorina. *Id*. ¶ 10. Members of the Law Department, Government Relations, and Corporate Communications subsequently prepared a draft communication for Senator Wyden's office, which was subsequently reviewed and revised by executives in the Law Department, Government Relations, Corporate Communications, and the Postal Inspection Service before being approved by the Postmaster General. *Id*. ¶¶ 55, 58, 63. The revised Privacy Act Statement was similarly prepared by Ms. Castorina and subject to the review of Mr. Marshall as General Counsel. *Id*. ¶ 15. As deliberations among subordinate and superior officials, these communications are protected under the deliberative process privilege. *See Machado Amadis*, 971 F.3d at 370 (holding that recommendations from subordinates to superiors "lie at the core of the deliberative-process privilege"); *CREW v. Dep't of Educ.*, 905 F. Supp. 2d 161, 173 (D.D.C. 2012) (concluding that records that predated final regulations "were thus predecisional in the plainest sense of the word.").

Moreover, "even purely factual information is protected by the deliberative process privilege when it is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Abramyan v. Dep't of Homeland Sec.*, 6 F. Supp. 3d 57, 64 (D.D.C. 2013) (internal quotation marks omitted); *In re Sealed Case,* 121 F.3d 729, 737 (D.C. Cir. 1997). Indeed, the D.C. Circuit has "caution[ed] against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases," as "the disclosure of even purely factual material may so expose the deliberative process within an agency that the material is appropriately held privileged." *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977)). As a result, purely factual information is nonetheless protected when "it reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors Guild v. Dep't of State,* 641 F.3d 504, 513 (D.C. Cir. 2011) (quoting *Mapother*, 3 F.3d at 1539). In particular, the deliberative process privilege protects "factual material . . . assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *Mapother,* 3 F.3d at 1539; *Montrose Chem.*, 491 F.2d at 68-69 (protecting summary of public testimony compiled to assist EPA Administrator's decision). For all three categories of records where information was withheld under the deliberative process privilege, any factual information was inextricably intertwined with the recommendations or advice that were being proffered. *Id*. ¶¶ 57-59.

Under these circumstances, the Postal Service properly withheld information pursuant to the deliberative process privilege.

## C.    The Postal Service Appropriately Applied the Attorney-Client Privilege

Privileged attorney-client communications were also appropriately withheld. These communications specifically concern internal clients' requests for legal advice from Postal Service

attorneys concerning the Privacy Act Statement and the statement of the Postal Service's Privacy Act compliance measures. 3d Supp. Castorina Decl. ¶¶ 61-63.

Matters subject to the attorney-client privilege are protected under Exemption 5. *Hall & Assocs. v. EPA,* 956 F.3d 621, 624 (D.C. Cir. 2020). The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Fisher v. United States*, 425 U.S. 391, 403 (1976); *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984). The privilege applies to communications between agency counsel and agency officials and employees who are their clients. *See, e.g.*, *In re Lindsey*, 148 F.3d 1100, 1104-05 (D.C. Cir. 1998). "Without protections for attorney-client communications, agency officials might not share information with their counsel in the first place, and would consequently be deprived of sound legal advice," and "[t]his very policy concern grounds FOIA's Exemption 5." *Pub. Emps. for Env't Resp. v. EPA*, 211 F. Supp. 3d 227, 230 (D.D.C. 2016). "Exemption 5 is intended to protect the quality of agency decision-making by preventing the disclosure requirement of the FOIA from cutting off the flow of information to agency decision-makers." *Id*. at 231.

Here, the Postal Service withheld portions of several email chains pursuant to the attorney-client privilege under FOIA Exemption 5, as reflected in the enclosed *Vaughn* index. The Law Department was involved in the preparation of the COVID-19 test kit webform only insofar as internal clients requested legal advice. 3d Supp. Castorina Decl. ¶ 62. Certain of these requests are a matter of standard agency practice but no less confidential in nature—specifically, the Law Department's "Ad Review" of public-facing marketing materials and the Privacy Office's review and advice concerning Privacy Act compliance. *Id.*  As the Postal Service developed the COVID-19 test kit webform, internal clients requested legal advice from the Business and Finance

Law group, which conducted the Ad Review (a confidential process) and answered specific questions concerning compliance in relation to the webform. *Id.*

Many such communications are between Ms. Castorina (the Postal Service's Chief Privacy and Records Management Officer (and an attorney)) with her subordinates and the General Counsel related to compliance with the Privacy Act. 3d Supp. Castorina Decl. ¶ 62. As the Privacy Office (which Ms. Castorina leads) is within the Law Department, it is Ms. Castorina's role as the Chief Privacy and Records Management Officer to provide legal advice as an attorney on Privacy Act matters, including drafting and approving Privacy Act Statements. 3d Supp. Castorina Dec. ¶¶ 3, 8, 35, 57, 59, 62. Internal clients contacted Ms. Castorina in her role as an attorney for legal advice regarding compliance with the Privacy Act as it applies to the COVID-19 test kit webpage. *Id.* ¶¶ 8-9, 62. Ms. Castorina and her staff held discussions with their internal clients to discuss any concerns and the nature of the request as it involved the Privacy Act's requirements including an appropriate Privacy Act Statement. *Id.* ¶¶ 57, 59, 62. These discussions informed the process by which Ms. Castorina and her staff formulated the Privacy Act Statement for the COVID-19 test kit webpage. *Id.*

In addition, attorneys in the Law Department—namely, Ms. Castorina and General Counsel Thomas Marshall—responded to requests by internal clients for legal advice concerning Privacy Act compliance, specifically in preparing a statement for Senator Wyden's office. 3d Supp. Castorina Decl. ¶¶ 58, 63. This correspondence included substantive comments and questions by internal clients in seeking legal advice, as well as deliberations and determinations by Ms. Castorina and Mr. Marshall as counsel. *Id.* Attorneys in the Law Department drafted a response, which was circulated among internal stakeholders and subject to further deliberation before the Postal Service supplied its response. *Id.* In this respect, the emails related to the inquiry

submitted by Senator Wyden's office are similarly privileged. *See Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quoting *Sealed Case*, 737 F.2d at 99).

Thus, the Postal Service appropriately applied the attorney-client privilege.

### D. The Postal Service Complied with FOIA's Foreseeable Harm Requirement

The Postal Service satisfied FOIA's requirement that, for each withholding, it "reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I); *Machado Amadis*, 971 F.3d at 370-71. The Postal Service's declarations explain that, with respect to each withholding, it was reasonably foreseeable that disclosure of the withheld information would harm an interest protected by the exemption relied upon.

#### 1. Deliberative Process Privilege

The Postal Service provides multiple explanations as to the foreseeable harm in release of the information withheld under the deliberative process privilege. The Postal Service was engaged in a substantial effort to facilitate the distribution of millions of COVID-19 test kits more than a year before the end of the Public Health Emergency in the United States. 3d Supp. Castorina Decl. ¶ 65. This represented a particularly important, fast-moving project that required input from across the organization. Disclosure of substantive communications in this context would have particularly far-reaching consequences for the Postal Service. *Id.*

Broadly, disclosing substantive email communications would prevent Postal Service officials, employees, and attorneys from speaking candidly amongst each other regarding new initiatives and policy developments. 3d Supp. Castorina Decl. ¶ 66. Disclosure would particularly chill communications among Postal Service employees, officials, and attorneys, because their discussions about draft materials as well as legal, business, and media strategies would be revealed. *Id.* Revealing internal policymaking and legal discussions would generally hinder postal officials

from contacting postal attorneys for their advice and recommendations and, accordingly, prevent postal officials from making appropriate judgments on behalf of the Postal Service. *Id.*

Disclosure would also result in harm specific to the communications at issue in this matter. In particular, certain of the records disclosed to Plaintiff make clear that community members and leaders are concerned about unnecessary or improper disclosures of consumer information. 3d Supp. Castorina Decl. ¶ 67. In part, the Privacy Act serves to protect against these types of disclosures; however, because other laws require the Postal Service to disclose information in certain contexts, Privacy Act compliance—including as to the preparation of an appropriate Privacy Act Statement—often requires substantial deliberation. *Id.* Correctly evaluating the Privacy Act is critical in ensuring that the Postal Service can gather the necessary information to provide its services—here, providing free COVID-19 test kits to the American public to help curb the spread of the infectious disease—and perform its functions while apprising the relevant parties of the ways their information might be used and ensuring that information is disclosed only to the extent allowed under the law. *Id.* The Postal Service is especially exacting as to Privacy Act compliance in part because of the organization's role in serving the whole American public. *Id.* Revealing recommendations, strategies, and legal opinions would discourage candid discussion of Privacy Act compliance issues, which would result in less rigorous legal analysis and conclusions. *Id.* Incorrect evaluation of the Privacy Act would cause not only incorrect Privacy Act Statements but also improper disclosure of information. *Id.*

The Postal Service has explained that disclosure would reveal internal counsel's deliberations concerning statutory compliance, along with the deliberations of high-ranking postal executives (including the Postmaster General and the General Counsel). 3d Supp. Castorina Decl. ¶ 68. Revealing these communications would impair the Postal Service's ability to make sound

agency decisions because executives would be reticent to share their thoughts amongst one another and their legal counsel. *Id.*

The Postal Service has explained that disclosure would also impair the Postal Service's relationship with other government entities, such as the White House. 3d Supp. Castorina Decl. ¶ 69. The redacted communications include those between postal employees and a White House employee, as well as those among postal employees discussing, and thereby incorporating, concerns raised by the White House. *Id.* If such communications were revealed, the White House would be unlikely to engage in full and frank communications with the Postal Service. *Id.* Importantly, revealing correspondence with a White House staffer would discourage frank communications between the White House and the Postal Service regardless of the Presidential administration at any given time. *Id.* n.70. Such communications are necessary, as government entities make proposals and share strategies with one another to best serve the public. *Id.* ¶ 69. The COVID-19 pandemic was a particularly prominent episode requiring coordination across government agencies; while that public health emergency has ended, new developments continually introduce challenges for the Federal Government, and government entities (including the Postal Service) must be positioned to communicate frankly to assess the needs of the public and craft appropriate interventions. *Id.* Ultimately, revealing such communications would harm the Federal Government's ability to function within itself. *Id.*

Based on these explanations, the Postal Service has provided the necessary link as to why release of the redacted information might cause a chilling effect on those individuals providing advice, recommendations, or input. *Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1015-16 (D.C. Cir. 2024) (finding that the Department adequately demonstrated foreseeable harm in a supplemental declaration where the Department identified the "'sensitive' nature of asylum

adjudications and the specific concern about facilitating asylum fraud" as factors that would affect the agency's ability to receive candid advice); *Keeping Gov't Beholden, Inc. v. Dep't of Just.*, Civ. A. No. 17-1569 (FYP), 2021 WL 5918627, at \*10 (D.D.C. Dec. 13, 2021) (foreseeable harm satisfied where agency explained that "how disclosure of the specific information at issue—the FBI Director's preliminary views regarding the Trump investigation—would discourage FBI employees from seeking advice about public statements regarding high-profile matters in the future."), *aff'd sub nom. Brody v. Dep't of Just.*, No. 22-5043, 2023 WL 1511679 (D.C. Cir. Feb. 3, 2023); *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir. 2021) (finding foreseeable harm satisfied where "the record establishes the unique sensitivity of discussions among Director Comey and high-ranking FBI officials about how to respond to an ongoing crisis that threatened existing covert Bureau operational tactics.").

The Postal Service has also explained why the risk of public confusion satisfies the foreseeable harm requirement. The Postal Service's explanation is similarly specific as the foreseeable harm explanation accepted by the Court in *Public Employees for Environmental Responsibility ("PEER") v. Department of Homeland Sec.*, 575 F. Supp. 3d 34, 51 (D.D.C. 2021). In *PEER*, the Court found the agency had "articulate[d] a specific link between the specified harm-public confusion-and the nature of the withheld records" by stating that "disclosure [] would harm [the agency] 'by prematurely revealing threats and hazards . . . [which] would . . . cause confusion to the public and may result in members of the public taking action on potential threats and hazards where no action is warranted,' or in a manner not 'suggested by a recommendation contained in the documents.'"

Like the explanation in *PEER*, the Postal Service has explained that disclosure would allow confidential discussions to be misconstrued by the public. 3d Supp. Castorina Decl. ¶ 70. Without

the benefit of context, certain opinions, recommendations, and strategies would be misappropriated and misstated. *Id.* In particular, disclosing portions of the emails that are not specifically deliberative in nature, but which are inextricably intertwined with the deliberative portions, would also cause harm. *Id.* The Postal Service is one of many governmental entities that collect personal information and, accordingly, must comply with the Privacy Act. *Id.* In part, the statute explicitly requires agencies to craft explanations of how personal information can be used, *see* 5 U.S.C. §§ 552a(e)(3)-(4), a process that inherently requires coordination among internal clients and attorneys. *Id.* If disclosed, portions of these conversations might be misconstrued, whether mistakenly or purposely, in a manner that suggests the Postal Service is misusing customer information, and the American public will erroneously mistrust the Postal Service and the Federal Government and, as a result, decline in the future to request the publicly available resources from the Federal Government that are designed to address any future public health emergency. *Id.* This would also place postal employees, officials, and attorneys in the position of having to defend against public confusion and distortions related to the Postal Service's information management, including as to the COVID-19 test kit webform. *Id.*

In these ways, the Postal Service's explanations are similar to other explanations of foreseeable harm that were deemed adequate by the Court. *See Tobias v. Dep't of Interior*, Civ. A. No. 22-167 (BAH), 2024 WL 894925, at *9 (D.D.C. Mar. 1, 2024) (finding foreseeable harm where disclosure would discourage "lack of candor" and therefore affect decision-making on certain permit applications and "mislead the public and cause public confusion by releasing information that does not represent a final agency decision" (internal quotation marks omitted)); *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 261 (D.D.C. 2020) (finding that explanations that would "inhibit officials from engaging in frank discussions about these issues and exploring

alternatives going forward . . .” and as a result, “would hamper agency-decision making,” and would also “provide[] the public with an erroneous understanding of agency-decisionmaking” “provide[d] more than adequate detail and context to satisfy the agency’s heightened burden.” (cleaned up)); *Cause of Action Inst. v. Dep’t of Veterans Affs.*, Civ. A. No. 20-997 (BAH), 2021 WL 1549668, at *16 (D.D.C. Apr. 20, 2021) (finding foreseeable harm where disclosure, in part, “would chill future agency deliberations, causing harm to the agency’s ability to obtain a comprehensive and thoughtful analysis” and “would generate confusion about the [the agency]’s plans” (cleaned up)).

### 2.    Attorney-Client Privilege

Foreseeable harm also exists in disclosing records protected by the attorney-client privilege. Outside of the deliberative process privilege, “an agency’s burden under the foreseeable harm requirement may be more easily met when invoking other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated.” *Reps. Comm. for Freedom of the Press v. Customs & Border Prot.,* 567 F. Supp. 3d 97, 119–20 (D.D.C. 2021). This applies to the attorney-client privilege. *Id*. “Release of attorney-client communications would undoubtably undermine our legal culture. Agencies would lose an important tool in their decisionmaking process—employees’ ability to confidentially consult agency lawyers.” *Id*. Otherwise, the “observance of law” promoted by the privilege would be hampered. *Id*. “Thus, the law already acknowledges and guards against the risk of harm that would come from disclosing attorney-client communications.” *Id*.

As described above, certain identified communications consist of email communications (1) between postal attorneys and internal clients or (2) among postal attorneys. 3d Supp. Castorina Decl. ¶ 71. The same harm described in relation to the deliberative process privilege would also

result from the disclosure of information withheld under the attorney-client privilege, with especially deleterious effects for the relationship between agency clients and internal attorneys. *Id.*

Here, revealing nascent attorney and internal client impressions about various iterations of the Privacy Statement, potential revisions thereto, and external concerns from the public and the White House would negatively impact the Postal Service's ability to appropriately respond to legal issues and public concerns. 3d Supp. Castorina Decl. ¶ 72. Exposing such communications to public scrutiny would interfere with the attorney-client relationship between postal attorneys and internal clients by impeding the sharing of candid advice that is critical to an attorney's ability to render legal advice. *Id.*

Disclosing such information would also reveal confidential information transmitted by internal clients and reveal the Postal Service's assessment of various legal issues implicating the Privacy Act Statement, along with its broader consideration of information disclosure obligations in relation to the Privacy Act. 3d Supp. Castorina Decl. ¶ 73.

Disclosure in this context would also raise concerns for the candid discussion of legal matters across the spectrum, as the Law Department provided advice in this context in the same manner as it does in relation to the voluminous requests for legal advice that it receives from across an organization of more than 600,000 employees. 3d Supp. Castorina Decl. ¶ 74. The Law Department's Ad Review and preparation of the Privacy Act Statement stemmed from typical requests for legal advice, and disclosure here would suggest that numerous other legal conversations would also be subject to disclosure. *Id.* This would broadly undermine the ability of internal clients and attorneys to discuss legal questions and to reach conclusions capable of withstanding the appropriate scrutiny. *Id.*

Based on these explanations, the Postal Service has specifically explained the foreseeable harm from release. *See, e.g., Reps. Comm.*, 567 F. Supp. 3d at 120 (concluding that it was enough for an agency to state: "Routine disclosure of information protected by attorney-client and/or attorney work product privilege would shake the very foundation of the legal profession, as clients would not feel comfortable asking for advice and attorneys would not feel comfortable providing it."); *Machado Amadis*, 971 F.3d at 370–73 (finding agency established foreseeable harm by noting that disclosure "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals" (cleaned up)); *Jud. Watch, Inc. v. Dep't of State*, 557 F. Supp. 3d 52, 61 (D.D.C. 2021) (finding foreseeable harm adequately described where State Department explained that, "[w]ithout the comfort of knowing that their candid discussions on sensitive legal issues will remain private within the Department, State officials and attorney-advisers would foreseeably be discouraged from engaging in those important discussions in the first place, thus seriously harming the Department's internal deliberative processes."); *Energy Pol'y Advocs. v. Dep't of State,* Civ. A. No. 19-3307 (TNM), 2023 WL 4198200, at *7 (D.D.C. June 27, 2023) (noting that the release of attorney-client communications "would undoubtedly undermine our legal culture because agencies would lose an important tool in their decisionmaking process—employees' ability to confidentially consult agency lawyers" (cleaned up)).

## IV.    **Defendant Complied with FOIA's Segregability Requirement**

The Postal Service complied with its segregability obligations. Under the FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information subject to FOIA must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably

intertwined with exempt portions." *Mead Data*, 566 F.2d at 260. To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Just.*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).

"It is by now firmly engrained that an agency may provide sufficient justification by describing the materials withheld, the exemption under which they were withheld, and an affidavit attesting that 'it released all segregable material.'" *De Sousa v. CIA*, 239 F. Supp. 3d 179, 202–03 (D.D.C. 2017) (citing *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson v. Exec. Off. for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002)). An "agency is not required to provide so much detail that the exempt material would be effectively disclosed." *Johnson*, 310 F.3d at 776 (citation omitted). Moreover, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

The Postal Service conducted a line-by-line review of the responsive records to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied. 3d Supp. Castorina Decl. ¶¶ 75-76. Based on the line-by-line review, all non-exempt information was segregated, and non-exempt portions were released. *Id.*

For these reasons, the Postal Service compiled with its segregability obligations.

\*    \*    \*

35

**CONCLUSION**

For the reasons set forth above, the Court should grant summary judgment in Defendants' favor.

Dated: December 12, 2024                    Respectfully submitted

                                            MATTHEW M. GRAVES, D.C. Bar #481052
                                            United States Attorney

                                            BRIAN P. HUDAK
                                            Chief, Civil Division

                                            By:    /s/ Erika K. Oblea
                                               ERIKA K. OBLEA, D.C. Bar #1034393
                                               Assistant United States Attorney
                                               601 D Street NW
                                               Washington, D.C. 20530
                                               (202) 252-2567
                                               Erika.oblea@usdoj.gov

                                            *Attorneys for the United States of America*