# APPENDIX 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICANS FOR FAIR TREATMENT,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br>*Defendants*. | **Civil Action No. 22-1183 (RCL)** |

### THIRD SUPPLEMENTAL DECLARATION OF JANINE CASTORINA

I, Janine Castorina, make the following Third Supplemental Declaration in lieu of affidavit in accordance with the provisions of 28 U.S.C. § 1746. I understand that my declaration may be introduced into the record of the above captioned action, or any other grievance, administrative proceeding, or suit pending in a court of law.

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I currently hold the position of Chief Privacy and Records Management Officer for the United States Postal Service. Prior to holding my current position, I was an Attorney in the Postal Service's Commercial and Appellate Litigation section from October 2011 to March 2016.

3.      In my official capacity as Chief Privacy and Records Management Officer, I am responsible for establishing Postal Service policies relating to information disclosure, privacy, and records management; ensuring compliance with privacy and records statutes, regulations, and policies; and providing oversight and supervision of the Postal Service Privacy and Records Management Office ("PRMO"), which, *inter alia*, receives, tracks, and advises postal officials on how to respond to Freedom of Information Act ("FOIA") requests. My responsibilities also include

1

managing and coordinating the Postal Service's response to certain litigation arising under the FOIA including the present complaint.

4.      As the Chief Privacy and Records Management Officer, it is my responsibility, and that of my group within the Postal Service, to assist internal stakeholders with responses to FOIA requests and to help those stakeholders understand and navigate the FOIA exemptions.

5.      This declaration supplements the declarations I provided in the above-captioned matter. *See* ECF Nos. 14-2, 22-1. For the sake of clarity, the present declaration includes descriptions of certain matters already described in my prior declarations.

### The Postal Service COVID-19 Rapid Test Webpage

6.      In January 2022, the White House announced that it was "purchasing one billion at-home, rapid COVID-19 tests to give to Americans for free."[1] The statement indicated that 500 million tests would be available for order later that month and that the White House was partnering with the U.S. Postal Service for packaging and delivery of these tests.

7.      The Postal Service began work on this substantial, important, and highly visible undertaking in early January 2022, ultimately developing a webpage through which members of the American public could request free COVID-19 test kits. In collaboration with the Administration for Strategic Preparedness and Response, the Postal Service has since delivered approximately 900 million free tests.[2]

8.      All Postal Service webforms that involve the collection of personal information

---

[1] *See* The White House, "Fact Sheet: The Biden Administration to Begin Distributing At-Home, Rapid COVID-19 Tests to Americans for Free" (Jan. 14, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/01/14/fact-sheet-the-biden-administration-to-begin-distributing-at-home-rapid-covid-19-tests-to-americans-for-free/.
[2] *See* U.S. Postal Service, "U.S. Postal Service to Continue Delivery of Millions of at Home COVID-19 Test Kits Nationwide" (Oct. 2, 2024), https://about.usps.com/newsroom/national-releases/2024/1002-usps-to-continue-delivery-of-millions-of-at-home-covid-19-test-kits-nationwide.htm.

must undergo a privacy review, which the PRMO performs under my direction. When such reviews indicate that the Postal Service must publish a statement pursuant to the Privacy Act, 5 U.S.C. § 552a(e)(3) ("Privacy Act Statement"), the PRMO drafts such a Statement. The Privacy Act Statement informs individuals of the authority for collecting the requested information, the use to which the information provided will be put, any potential routine uses, and the effect of providing the information or the failure to do so

9.    In the first week of January 2022, Postal Service employees Heather Dyer, Vice President of the Corporate Information Security Office (Chief Information Security Officer); Chrstopher Karpenko, Executive Director of Brand Marketing; and Kimberly Workinger, Digital Brand Marketing Manager, contacted me to request legal advice to ensure that the COVID-19 rapid test webform was compliant with the Privacy Act.

10.    After discussing the webform with Ms. Dyer, Mr. Karpenko, and Ms. Workinger, I spoke with Privacy and Records Compliance Specialist Christopher Gillespie and Privacy and Records Manager Christopher Lind to discuss drafting a Privacy Act Statement to display on the site. Following these discussions, Mr. Gillespie and Mr. Lind drafted a Privacy Act Statement for the COVID-19 rapid test webform, for my review. I made edits to that draft and the PRMO finalized the Privacy Act Statement.

11.    During this period, the Corporate Law section of the Law Department also conducted its standard review of advertising content, broadly defined. Contributors to this "Ad Review" included Maria Votsch, Chief Counsel, Business and Finance Law, and Karren Vance, an attorney in Business and Finance Law.

12.    The COVID-19 rapid test webform was first published at https://special.usps.com/testkits on January 18, 2022, featuring a Privacy Act Statement stating:

3

Privacy Act Statement

Your information will be used to provide COVID-19 Testing Kits to the address you provided, and to provide company and product fulfillment information about that testing kit to a federal executive agency. Collection is authorized by 39 U.S.C. 401, 403, 404, and 411. Supplying your information is voluntary, but if not provided, we may not be able to fulfill your request for a COVID-19 Testing Kit. We do not disclose your information to third parties without your consent, except to act on your behalf or request, or as legally required. This includes the following limited circumstances: to a congressional office on your behalf; to agencies and entities to facilitate or resolve financial transactions; to a U.S. Postal Service auditor; for law enforcement purposes, to labor organizations as required by applicable law; incident to legal proceedings involving the Postal Service; to government agencies in connection with decisions as necessary; to agents or contractors when necessary to fulfill a business function or provide products and services to customers; for customer service purposes; and to other federal executive agencies pursuant to 39 U.S.C § 411. For more information regarding our privacy policies visit www.usps.com/privacypolicy.

13.    On January 19, 2022, a staff member for the office of U.S. Senator Ron Wyden emailed the PRMO's general email address, privacy@usps.gov, inquiring whether the Privacy Act Statement, which permitted information disclosure "for law enforcement purposes," could result in personal information being shared with U.S. government immigration agencies. A member of the public raised a similar question around the same time.

14.    Postal Service Vice President of Corporate Communications Jeffery Adams then emailed with Subhan Cheema of the White House's COVID-19 Response Team regarding the Privacy Act Statement.

15.    Between January 19, and 27, 2022, several Postal Service employees, including General Counsel Thomas Marshall and I, corresponded regarding revisions to the Privacy Act Statement.

16.    On January 28, 2022, the COVID-19 rapid test webform was updated to include the following revised Privacy Act Statement:

Privacy Act Statement

Your information will be used to provide COVID-19 Testing Kits to the address you provided, and to provide *product fulfillment* information about that testing kit to a federal executive agency. Collection is authorized by 39 U.S.C. 401, 403, 404, and 411. Supplying your information is voluntary, but if not provided, we may not be able to fulfill your request for a COVID-19 Testing Kit. We do not disclose your information to third parties without your consent, except to act on your behalf or request, or as legally required. This includes the following limited circumstances: to a congressional office on your behalf; to agencies and entities to facilitate or resolve financial transactions; to a U.S. Postal Service auditor; *for law enforcement purposes involving crimes or fraud against the Postal Service*; to labor organizations as required by applicable law; incident to legal proceedings involving the Postal Service; to government agencies in connection with decisions as necessary; to agents or contractors when necessary to fulfill a business function or provide products and services to customers; for customer service purposes; and to other federal executive agencies pursuant to 39 U.S.C § 411. For more information regarding our privacy policies visit www.usps.com/privacypolicy.

17.     The Postal Service did not revise the Privacy Act Statement appearing on the COVID-19 rapid test webform at any other time between January 28, 2022, and April 28, 2022, the date the present lawsuit was filed.

## The FOIA Request and Administrative Process

18.     By letter dated February 7, 2022, Plaintiff submitted a request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for the following:

a.      All records concerning the "Privacy Act Statement" contained on USPS's webform through which members of the public may order rapid antigen COVID-19 tests (https://special.usps.com/testkits). The records requested include, but are not limited to, those that reflect USPS's decision to depart from using its default "Privacy Act notice" that is "for personal information collected online" (which is published at https://about.usps.com/who/legal/privacy-policy/full-privacy-policy.htm) and instead to use a "Privacy Act Statement" that says USPS may, without consent, disclose information it obtains about the public through the COVID-19 test webform to "labor organizations as required by applicable law." (hereinafter, "Item No. 1")

b.      All records concerning USPS's disclosure to any labor organization of information it obtained through the COVID-19 test webform. (hereinafter, "Item No. 2")

5

19.     Between February 8, 2022, and February 11, 2022, Plaintiff and Senior Government Information Specialist Marthea Hodge exchanged communications discussing the scope of the FOIA request.

20.     In the ensuing days, I discussed this request with Ms. Hodge, and the Postal Service conducted a search for responsive records. Initially, the Postal Service construed Item No. 1 of the request as seeking records related to the decision to "depart" from the Privacy Policy on USPS.com in preparing the Privacy Act Statement appearing on the COVID-19 test kit webpage. No such decision was made, because they are unrelated: The Privacy Policy arises from the Postal Service's voluntary compliance with the E-Government Act of 2002, while the Privacy Act Statement arises from the Privacy Act of 1974. The Privacy Policy webpage does include an example of a Privacy Act Statement; however, the Postal Service prepares specific Privacy Act Statements for all instances (on- and offline) in which it collects personally identifiable information, and the Postal Service does not collect such information on the Privacy Policy webpage. Here, there was not a decision to depart from either the Privacy Policy webpage or the example Privacy Act Statement appearing on that page in drafting the Privacy Act Statement for the COVID-19 test kit webform. Construing Item No. 1 in this manner, there were no records responsive to this part of the request.

21.     As to Item No. 2 of the request, Ray Donahue, Managing Counsel of Labor Law, conducted the Postal Service's search for responsive records. Mr. Donahue oversees all of the Postal Service's legal matters concerning labor organizations. Accordingly, Mr. Donahue reviewed his team's shared drive for materials concerning a disclosure to a labor organization by browsing the team's files related to information disclosures. Mr. Donahue does not keep paper files, and his search did not return any responsive records.

22.     Separately, the Postal Service's Labor Relations department directly communicates

6

with union management and responds to union inquiries. Labor Relations is divided into four sections, with one section for each of the labor unions—the American Postal Workers Union ("APWU"), the National Association of Letter Carriers ("NALC"), the National Postal Mail Handlers Union ("NPMHU"), and the National Rural Letter Carrier's Association ("NRLCA"). Each section has a department head who tracks union requests, logging each union request and ensuring that the requests are responded to, as required by law. The individuals maintain spreadsheets documenting requests from their respective unions. At Mr. Donahue's request, the department heads reviewed all union requests for the period between January 2022 and the date of the request to determine whether their respective unions requested test kit information. During this process, the relevant individuals reviewed all union information requests without search terms. However, the searches revealed no responsive records. In other words, no union requested information gathered on the COVID-19 test kit webpage, and the Postal Service provided no such information to any labor union.

23.    By letter dated February 25, 2022, Ms. Hodge issued an initial decision. In this decision, Ms. Hodge informed Plaintiff that as to Item No. 1, there were no responsive records reflecting a decision by the Postal Service to substitute the Privacy Policy on USPS.com with a Privacy Act Statement for the COVID-19 test kit webform because no such decision was made. As to Item No. 2 of the request, Ms. Hodge informed Plaintiff that the Postal Service had identified no responsive records.

24.    By letter dated March 15, 2022, Plaintiff administratively appealed the initial decision to the Office of the General Counsel. Plaintiff primarily argued that the Postal Service (1) erroneously interpreted Item No. 1 and (2) should have discovered responsive records as to Item No. 2 of the FOIA request because records must exist.

25. On appeal, the Office of the General Counsel agreed with Plaintiff's first argument, determining that the Postal Service had interpreted Item No. 1 of the request too narrowly. Specifically, the initial no-records response pertained to records related to a decision to "depart" from the Privacy Notice on USPS.com in drafting the COVID-19 test kit webpage's Privacy Act Statement; however, the Office of the General Counsel determined that an additional search was necessary because the request had more broadly requested "[a]ll records concerning the 'Privacy Act Statement'" on the COVID-19 test kit webpage.

26. Accordingly, on appeal, the Postal Service searched for records responsive to Item No. 1 of the FOIA request in several steps. The Postal Service's Information Catalog Program ("ICP"), the component with access to the Postal Service's email repository for the purposes of conducting email searches, performed the first step of the search. In response to Item No. 1, the PRMO, requested that ICP search the email accounts of six Postal Service employees for (1) the term "Privacy Statement" or (2) the full text of the Privacy Act Statement ultimately used on the COVID-19 rapid test webform (*i.e.*, the full Privacy Act Statement enclosed in quotation marks). The six email addresses included three belonging to employees in the Privacy and Records Management Office—myself, Mr. Gillespie, and Mr. Lind. The other three email addresses belonged to internal clients—Ms. Dyer, Mr. Karpenko, and Ms. Workinger. ICP searched these six email accounts because of the involvement of these individuals in preparing the COVID-19 rapid test webform and the accompanying Privacy Act Statement. ICP did not use a date range for this search. However, the search returned no records.

27. Because I was personally involved in preparing the Privacy Act Statement for the COVID-19 rapid test webform, I recalled exchanging email communications about the Privacy Act Statement. Accordingly, the PRMO personnel involved in this matter—Mr. Gillespie, Mr.

8

Lind, and I—browsed our own email archives and determined that the terms "Privacy Act Statement" and "810" (the identifier corresponding to the Privacy Act System of Records for USPS.com registration information) might return responsive records. The same three individuals therefore used these terms to search our individual Outlook inboxes. This search returned nine pages of responsive records.

28.    On April 6, 2022, the Postal Service, via the Office of the General Counsel, issued its decision concerning the administrative appeal. The Postal Service produced the nine pages of records responsive to Item No. 1. Concerning Item No. 2, the Postal Service affirmed a finding of no responsive records, notwithstanding Plaintiff's argument that responsive records must exist— in other words, that the Postal Service would not have referred to the possible disclosure of information to "labor organizations as required by applicable law" if no such disclosures then occurred. As to this point, I note that the Postal Service has properly included "Disclosure to Labor Organizations" among its Privacy Act Standard Routine Uses for decades.[3] Furthermore, the same or similar language concerning disclosures "to labor unions as required by applicable law" has appeared in Postal Service Privacy Act Statements predating the COVID-19 test kit webform.[4] Plaintiff's assertion that responsive records must exist was not persuasive concerning the adequacy

---

[3] *See, e.g.*, Privacy Act of 1974; Systems of Records, 54 Fed. Reg. 43,652, 43,655 (Oct. 26, 1989) (identifying "Disclosure to Labor Organizations" under the "Prefatory Statement of Routine Uses"); Privacy Act of 1974, System of Records, 67 Fed. Reg. 77,086, 77,090, 77,093 (Dec. 16, 2002) (providing notice that the Standard Routine Use concerning "Disclosure to Labor Organizations" applies with respect to the systems of records containing customer information submitted via USPS.com), https://www.federalregister.gov/documents/2002/12/16/02-31386/privacy-act-of-1974-system-of-records; Privacy Act of 1974, System of Records, 70 Fed. Reg. 22,516 (April 29, 2005), https://www.federalregister.gov/documents/2005/04/29/05-8444/privacy-act-of-1974-system-of-records; *see also* Handbook AS-353, Guide to Privacy, the Freedom of Information Act, and Records Management: D.2. Standard Routine Uses, available at https://about.usps.com/handbooks/as353/as353apdx_007.htm.
[4] *See, e.g.*, PS Form 650 ("Request for ELM 650 Mediation"), updated in March 2015; PS Form 999 ("Application for Reinstatement List"), updated in July 2017; PS Form 1093 ("How to Apply for a PO Box"), updated in August 2019.

of the Postal Service's search and also appears to be based on a misconception of the Postal Service's Privacy Act Statements as a general matter.

29.     On April 28, 2022, Plaintiff filed the instant suit.

### Court Order and First Supplemental Search

30.     On March 23, 2023, following briefing by the parties, the Court identified various deficiencies in the Postal Service's responses to Plaintiff's FOIA request. Specifically, the Court determined that the Postal Service's explanation of its search was inadequate in three ways: (1) the supporting affidavits did not identify the search terms used for either item of the request or the type of search performed as to Item No. 2; (2) the Postal Service did not search the records of three employees with some involvement in the preparation of the Privacy Act Statement; and (3) the Postal Service did not explain why it did not search for records related to the revised Privacy Act Statement. The Court further identified two deficiencies in the Postal Service's assertion of FOIA exemptions: (1) the Postal Service did not explain the applicability of the attorney-client privilege concerning certain email chains involving only legal personnel (by not explaining the extent to which those chain rest on confidential client communications); and (2) the Postal Service did not offer a sufficiently specific foreseeable harm justification as to its deliberative-process privilege withholdings and did not offer any foreseeable harm justification for its attorney-client privilege withholdings.

31.     Accordingly, the Court ordered the Postal Service to conduct an additional search, including the records of Mr. Karpenko, Ms. Workinger, and Ms. Dyer and further including records concerning changes made to the Privacy Act Statement. In addition, the Court directed the Postal Service to identify the search terms used and the type of search performed both in the previous search and in the new search. Finally, the Court ordered the Postal Service to file a new

*Vaughn* index and supporting affidavit correcting the exemption-related deficiencies described above.

32.     Pursuant to this Order, my office requested that ICP search these three individuals' email accounts for the same search terms as resulted in the identification of the first nine pages of responsive records—"Privacy Act Statement" and "810." This search resulted in the identification of 14 additional pages of responsive records. The Postal Service applied the appropriate redactions to the documents and provided them to the Department of Justice for production to Plaintiff.

33.     The Court also directed the Postal Service to conduct a supplemental search for records relating to a revision to the Privacy Act Statement appearing on the COVID-19 rapid test webpage. However, Plaintiff's description of this revision appears to be based on the false premise that the Privacy Act Statement was revised between the date of the original FOIA search (February 7, 2022) and the date of the administrative appeal (March 15, 2022). Although the Privacy Act Statement was revised once (as described above), this revision was implemented on January 28, 2022, before Plaintiff filed the FOIA request,[5] and the text of the Privacy Act Statement was unchanged when Plaintiff submitted its administrative appeal to the Postal Service on March 15, 2022.

34.     Nevertheless, in response to the Court's order, the Postal Service performed a supplemental search for records regarding this prior revision to the Privacy Act Statement in

_____

[5] Members of the public can view the COVID-19 test kit webpage as it appeared before and after that date by searching for the page's URL—https://special.usps.com/testkits—on the Internet Archive's Wayback Machine at https://web.archive.org/. For example, the Wayback Machine allows users to view the webpage as it existed at 10:45 p.m. on January 28, 2022. *See* U.S. Postal Service, "Place Your Order for Free At-Home COVID-19 Tests" (as visible on Jan. 28, 2022), archived at https://web.archive.org/web/20220128224545/https://special.usps.com/testkits; *see also* U.S. Postal Service, "Place Your Order for Free At-Home COVID-19 Tests" (as visible on Jan.              18,              2022),              archived              at https://web.archive.org/web/20220128224545/https://special.usps.com/ testkits (emphasis added).

11

question. As noted above, on January 19, 2022, a staffer for Senator Ron Wyden emailed a postal employee concerning two issues, one of which concerned immigration and enforcement by U.S. Immigration and Customs Enforcement ("ICE") (and the other of which did not concern the Privacy Act Statement). This communication was forwarded to Jeffery Adams, Vice President of Corporate Communications, who then contacted the White House on January 25, 2022. Thereafter, the White House communicated its views regarding the Privacy Act Statement as it related to the concerns raised by Senator Wyden's office. Internal discussions took place during the ensuing period, and on January 28, 2022, the revised Privacy Act Statement went live on the COVID-19 test kit webpage.

35. Recalling the timing of this revision, Mr. Gillespie, Mr. Lind, and I browsed our email archives for relevant email traffic from January 25 to 27, 2022. Based on this review, we identified the terms "Privacy Concern" and "Test Kit Web Info," which would be both broad enough and specific enough to capture any records that related to a revision of the Privacy Act Statement. ICP used these search terms in the email archives of myself, Mr. Lind, Mr. Gillespie, Ms. Dyer, Mr. Karpenko, and Ms. Workinger, along with Mr. Adams, Vice President of Government Relations Peter Pastre, and General Counsel Thomas Marshall (who appeared on the emails we identified through our initial search). The email addresses used were targeted to capture individuals at the Postal Service involved with any revision to the Privacy Act Statement. To reiterate, Mr. Gillespie, Mr. Lind, and I all work for the PRMO and were involved in the revision because our office governs Privacy Act Statements. Ms. Workinger, Mr. Karpenko, and Ms. Dyer all jointly had control over the test kit webform and supervised the employees and contractors responsible for the technical development of that page, and they might have been involved in the revision to the extent that they would be provided text to post on the website. Mr. Adams is the

Vice President of Corporate Communications and was involved in the revision to the extent that it resulted from outside comments and concerns. Mr. Pastre is the Vice President of Government Relations and was involved in the revision for the same reasons as Mr. Adams. Mr. Marshall is the General Counsel and therefore supervises my team. The Privacy and Records Management Office falls within the Law Department and the General Counsel would accordingly be copied on revisions, given the visibility of the test kit initiative. The search criteria used for this search differed from the prior searches because the discussion concerning the revision occurred separately from the creation of the Privacy Act Statement and occurred during a different timeframe.

36.    Following this search, we located 27 pages of responsive records. Those records were properly redacted and provided to the Department of Justice for production to Plaintiff.

**Second Supplemental Search**

37.    After the Postal Service filed its new Motion for Summary Judgment on July 31, 2024, Plaintiff contacted the Postal Service regarding the adequacy of the supplemental searches. Specifically, Plaintiff noted that the responsive records included references to attachments that were not included and were not accounted for in Plaintiff's revised *Vaughn* index. In addition, Plaintiff requested that the Postal Service search the records of not only the parties identified by the Court but also all parties copied on any email included in the Postal Service's production.

38.    The Postal Service agreed that the attachments in question should have been produced or accounted for in the updated *Vaughn* index. Because of personnel changes within the Postal Service, we have been unable to determine the reason for this omission; it seems possible that in the course of deduplicating email records, the Postal Service produced only the latest messages in certain email chains, omitting attachments to earlier messages.

39.    Accordingly, the Postal Service conducted a second supplemental search for

responsive records in coordination with ICP. In two respects, this search was structured in a manner that exceeded the requirements of the FOIA. First, the Postal Service attempted to use search terms so broad as to encompass any potentially responsive record, in addition to a far greater number of unresponsive records. This search used a date range of January 1, 2022, to April 6, 2022 (the date of the Postal Service's administrative appeal decision), and five sets of terms and connectors:

    a.     Subhan[6] OR Wyden OR [the last name of the member of the public who contacted the Postal Service regarding concerns about the Privacy Act Statement]

    b.     810[7]

    c.     "your information will be used to provide Covid-19 testing kits"[8]

    d.     "Privacy Statement updated" OR "new Privacy Statement"[9]

    e.     ("Project T"[10] OR "test kits" OR "testing kits") AND ("privacy policy" OR "Privacy Statement" OR "Privacy Act Statement")

These search terms are so broad as to encompass any potentially responsive record (*i.e.*, any record related to the Privacy Act Statement appearing on the COVID-19 test kit website, broadly defined). In addition, these terms were likely to—and did, in fact—return far more unresponsive records than responsive records.

    40.     Second, the Postal Service expanded the number of custodians at Plaintiff's request. Specifically, this second supplemental search extended to the email records of every person who sent, received, or was copied on any of the emails previously produced to Plaintiff and any other employee mentioned in any of the Postal Service's filings, although these individuals were not

---

[6] "Subhan" is the first name of the White House staff member with whom Mr. Adams corresponded concerning revisions to the Privacy Act Statement.

[7] "810" is the number of the Privacy Act System of Records containing records related to USPS.com (including the COVID-19 test kit webpage).

[8] This is a phrase included in the Privacy Act Statement appearing on the COVID-19 test kit website.

[9] These terms appeared in email conversations that the Postal Service has already identified as responsive.

[10] "Project T' was the internal label for the development of the COVID-19 test kit webpage.

likely to possess records not possessed by the custodians whose records had already been searched. The search accordingly encompassed the records of 28 individuals, including the nine custodians whose records had already been searched (myself, Mr. Lind, Mr. Gillespie, Ms. Dyer, Ms. Workinger, Mr. Karpenko, Mr. Marshall, Mr. Pastre, and Mr. Adams) and 19 additional custodians requested by Plaintiff (Mr. Donahue; Ms. Votsch; Postmaster General Louis DeJoy and Chief of Staff Heather Clarke; Chief Postal Inspector Gary Barksdale; Vice President of Customer Experience Marc McCrery; Government Relations Representative Cory Brown; Manager of Customer Contact Internal and Contracts David Colon; and contractors Solana Lazarte, Mark Ross, Elliott Rosner, Andrew Hung, Brittnee Hodges, Joseph Loong, Maya Lilley, Gabriel Freytes, Margaret Claire Dykes, Mark Kosnoff, and Shilpa Chukka).

41.    The second supplemental search returned 465 pages of responsive records, in addition to several thousand pages of unresponsive records. Of these, numerous pages contained additional strands and attachments of already-produced email chains, and only ten documents were possessed by custodians other than the nine individuals whose records the Postal Service searched in its first supplemental search. Five of these concern technical updates to the COVID-19 test kit website, and five concern communications with Senator Wyden's office; none concerns the preparation of the Privacy Act Statement.

42.    The Postal Service redacted the responsive pages and produced them to Plaintiff.

### Third Supplemental Search

43.    After the Postal Service produced the records retrieved via the second supplemental search, Plaintiff requested that the Postal Service search the records of additional custodians, highlighting three custodians as particularly relevant—Ms. Vance, Chief Counsel of Ethics and Legal Compliance Ruth Stevenson, and the general privacy@usps.gov email address. Ms. Vance

15

and Ms. Stevenson were unlikely to independently possess responsive records. As described above, although Ms. Vance participated in the Law Department's review of the COVID-19 test kit website, she was not responsible for drafting or for independently reviewing the Privacy Act Statement. Rather, any relevant communications would include one or more other individuals whose records have already been searched (including me, Ms. Votsch, and Mr. Marshall). Ms. Stevenson was also unlikely to independently possess responsive records; her involvement in this matter was limited to communications with me, and my records were already searched. Any relevant communications in Ms. Stevenson's possession would have also been possessed by me or Mr. Marshall.

44.    Nevertheless, in a gesture of good faith and to ensure that all responsive records were gathered from the privacy@usps.gov email account (which is not specifically assigned to any Postal Service employee), the Postal Service conducted a third supplemental search for responsive records. This search, performed by ICP, encompassed the records of Ms. Vance, Ms. Stevenson, and the privacy@usps.gov account, and it used the following terms and connectors: "your information will be used to provide COVID-19 testing kits" OR "privacy statement updated" OR "new privacy statement" OR (("Project T" OR "test kits" OR "testing kits") AND ("privacy policy" OR "privacy statement" OR "privacy act statement")). The date range of the search was January 1, 2022, to April 6, 2022.

45.    No additional responsive material was located in Ms. Vance's or Ms. Stevenson's records; however, the search returned four pages of responsive records located in the privacy@usps.gov inbox. These pages were appropriately redacted and produced to Plaintiff.

**Adequacy of Searches**

46.    Plaintiff has indicated that it no longer disputes the adequacy of USPS's search.

Nonetheless, given the Court's instructions in its May 23, 2023, Order, USPS provides the following explanation of its searches.

47.    The facts described above address the adequacy of the Postal Service's five efforts to identify records responsive to both parts of Plaintiff's request. In its Order dated March 23, 2023, the Court assessed the Postal Service's initial response and its response to Plaintiff's administrative appeal, identifying three matters to address: (1) setting forth the search terms used for each item of the request or the type of search performed with respect to Item No. 2; (2) searching the records of three specific employees involved in the development of the COVID-19 test kit website and (3) searching for records related to a revision to the Privacy Act Statement on the COVID-19 test kit website that must have existed at the time of its eventual search. The Postal Service has more than satisfied these components of the Court's Order.

48.    First, the Postal Service has identified the search terms it used for each of its searches.  These terms, including the excessively broad terms used in the Postal Service's second and third supplemental searches, are documented above. *See supra*, ¶¶ 25-26, 34, 38, 43.As to Item #2 of Plaintiff's request, the Postal Service's process of searching for records responsive to this part of the request is described above. *See supra*, ¶¶ 20-21. This search returned no responsive records because there have been no disclosures of information obtained via the COVID-19 test kit website to labor organizations. In compliance with the Court's Order, the Postal Service has also explained the particular nature of its search for responsive records. *See id.*

49.    Second, the Postal Service conducted supplemental searches of the records of the individuals named by the Court and has conducted searches of numerous additional custodians unlikely to possess separate responsive records. *See supra*, ¶¶ 31-43. As indicated above, the Postal Service voluntarily expanded its first supplemental search to include the records of Mr. Pastre, Mr.

Adams, and Mr. Marshall. *See supra*, ¶ 34. At Plaintiff's request, the Postal Service conducted a second supplemental search that included 19 additional custodians. *See supra*, ¶¶ 36-41. Following a second request by Plaintiff, the Postal Service conducted a third supplemental search that included three additional custodians about whom Plaintiff expressed particular interest. *See supra*, ¶¶ 42-44. The Postal Service has already conducted searches that meet and exceed the FOIA's standard of adequacy. Based on my role in preparing the Privacy Act Statement on the COVID-19 test kit website, I knew that responsive records were most likely to be located among the records of specific Postal Service personnel—particularly, myself, Mr. Lind, and Mr. Gillespie, along with Mr. Karpenko, Ms. Workinger, and Ms. Dyer. Notwithstanding apparent imperfections in the Postal Service's initial searches, the Postal Service has now conducted a comprehensive review of those individuals' records, in addition to the records of numerous other Postal Service employees. Further Postal Service employees are unlikely to possess other responsive records.

50.    Third, the Postal Service has complied with the Court's Order by conducting keyword searches specifically targeting the revision to the Privacy Act Statement. *See supra*, ¶¶ 33-34, 38. The Postal Service searched the records of the parties involved in discussions regarding this revision and used terms broad enough to encompass all responsive records. For example, the Postal Service used the names of White House and Congressional personnel connected with these discussions, along with broader terms meant to encompass all records related to the Privacy Act Statement on the COVID-19 test kit website, whether before or after the revision that occurred on January 28, 2022. No party other than those whose records have already been searched is likely to possess other responsive records.

51.    The Postal Service also conducted these searches using the timeline January 1, 2022, and April 6, 2022. *See supra* ¶¶ 39, 44. The Postal Service used this timeline because there

18

were no revisions to the Privacy Act Statement after January 28, 2022, and the Postal Service issued its administrative appeal decision on April 6, 2022. *See supra* ¶ 17. In sum, all locations and all custodians likely to contain responsive records were searched. I believe that the searches performed were reasonably calculated to uncover and identify all records potentially responsive to Plaintiff's FOIA request that were within the custody, control, or possession of the Postal Service.

## USPS's Withholdings

52.    Plaintiff has indicated that it does not dispute USPS's withholdings under Exemptions 3 and 6. As a result, USPS only provides explanations of its invocation of Exemption 5 below.

## Exemption 5

53.    *Deliberative Process Privilege*: In its Order dated March 23, 2023, the Court concluded that the Postal Service has adequately shown that the deliberative process privilege applies to the material redacted from pages USPS_1–USPS_9 pursuant to FOIA Exemption 5. ECF No. 30 at 18-19. The Court instructed the Postal Service to clarify, in its assertions of Exemption 5, whether that Exemption applies due to the deliberative process privilege or the attorney-client privilege, or both. *Id.* at 17-18.

54.    The deliberative process privilege applies in each instance where the Postal Service has asserted Exemption 5, in both the initial production (USPS_1–USPS_9) and the supplemental productions (USPS_10–USPS_519). The bodies of certain produced emails have been redacted under Exemption 5 pursuant to both the deliberative process privilege and the attorney-client privilege; to the extent these redactions depend on the deliberative process privilege, they protect internal communications amongst the Postal Service's legal counsel and internal clients, including myself; Thomas Marshall, Executive Vice President and General Counsel; Maria Votsch and

19

Karren Vance of Business and Finance Law; Peter Pastre, Vice President of Government Relations; Jeffery Adams, Vice President of Corporate Communications; Kimberly Workinger, Manager of Digital Marketing; Heather Dyer, Chief Information and Security Officer and Vice President; Gary Barksdale, Chief Postal Inspector; Mary Ann Simpson and Cory Brown of the Government Relations office; and numerous contractors.

55.    All communications were pre-decisional as to three distinct developments. First, the communications that occurred prior to January 18, 2022, preceded the publication of the COVID-19 test kit webform.[11] These communications were pre-decisional as to both the webform as a whole and as to the Privacy Act Statement specifically. Next, in response to the inquiry from Sen. Wyden's office, members of the Law Department, Government Relations, and Corporate Communications developed a statement, for at least limited external circulation, explaining the effect of the Privacy Act Statement, the Postal Service's compliance with the Privacy Act, and its commitment to protecting personal information. Several communications were pre-decisional as to the statement that the Government Relations office shared with Sen. Wyden's office.[12] Finally, several communications were pre-decisional as to the revision of the Privacy Act Statement that

---

[11] Documents related to technical development of or updates to the COVID-19 test kit webform include: USPS6, USPS7, USPS8, USPS20, USPS29, USPS30, USPS31, USPS32, USPS33, USPS34, USPS35, USPS38, USPS39, USPS93, USPS94, USPS96, USPS97, USPS98, USPS99, USPS101, and USPS102. The Law Department's "Ad Review" and development of the original Privacy Act Statement occurred prior to the initial publication of the COVID-19 test kit webform. Documents related to the Law Department's Ad Review process include: USPS15, USPS16, USPS17, USPS20, USPS21, USPS23, USPS24, and USPS25. Documents related to the preparation of the original Privacy Act Statement include: USPS1, USPS2, USPS3, USPS4, USPS5, USPS16, USPS17, USPS19, USPS23, USPS24, USPS25, and USPS26.

[12] Documents related to the preparation of a response to Sen. Wyden's office include: USPS6, USPS7, USPS8, USPS41, USPS42, USPS43, USPS45, USPS46, USPS48, USPS49, USPS50, USPS51, USPS52, USPS53, USPS54, USPS55, USPS56, USPS57, USPS59, USPS60, USPS61, USPS62, USPS63, USPS64, USPS65, USPS67, USPS68, USPS69, USPS70, USPS71, USPS72, USPS73, USPS74, USPS75, USPS76, USPS77, USPS78, USPS79, USPS80, USPS81, USPS82, USPS83, USPS84, USPS85, USPS86, USPS87, USPS88, USPS89, USPS90, and USPS91.

occurred on January 28, 2022, as members of the Law Department worked to clarify the Postal Service's notice of information disclosures required under the Privacy Act.[13]

56.     The communications are also deliberative. As stated, the Postal Service developed the COVID-19 test kit webform in relation to a White House initiative to make one billion tests available to Americans for free. As a collaboration with the White House and a contribution to the Federal Government's response to the COVID-19 pandemic, the Postal Service understood the project of making these test kits available to the American public to be a critical endeavor, and the Postal Service expected many millions of Americans to request the free test kits.

57.     The responsive communications related to the initial development of the COVID-19 test kit webform were deliberative in that they concerned the publication of a webpage that would draw significant traffic, as the American public requested the tests made available by the White House. This project involved contributions from a wide range of personnel within the Postal Service, including employees in Government Relations, Corporate Communications, the Corporate Information Security Office, Brand Marketing, the Law Department, and other agency components. These individuals made contributions in developing the final webform offered by the Postal Service. More specifically, many responsive communications concern the Privacy Act Statement appearing on that page. These communications were deliberative in that they reflected the input of various members of the Law Department in working out the proper language to comply with the Privacy Act (and appropriately inform users of the matters set forth under the Privacy Act, including concerning the "routine uses" applicable to the COVID-19 test kit webform). Any factual input, moreover, was inextricably intertwined with the employees' recommendations for

---

[13] Documents related to the preparation of the revised Privacy Act Statement include: USPS6, USPS7, USPS8, USPS73, USPS74, USPS75, USPS76, USPS77, USPS78, USPS79, USPS80, USPS81, USPS82, USPS83, USPS84, USPS85, USPS86, USPS87, USPS88, USPS89, USPS90, USPS91, USPS95, USPS97, USPS98, USPS99, USPS101, USPS102, USPS105, and USPS106.

inclusion in the Privacy Act Statement.

58. Communications concerning the preparation of the Postal Service's response to Sen. Wyden's office were also deliberative. While the statement itself is not subject to the deliberative process privilege (and, accordingly, has not been redacted), communications regarding earlier drafts were important in facilitating development of the Postal Service's ultimate response. Furthermore, this response reflected recommendations and contributions from several members of Postal Service management, including the Vice Presidents of Corporate Communications and Government Relations, the General Counsel, and the Chief Postal Inspector, and it ultimately traveled up the chain of command to the Postmaster General. These contributions helped the Postal Service to clearly explain its Privacy Act compliance efforts, a particularly important issue given the large volume of test kit requests the Postal Service expected to receive. Any factual information, moreover, was inextricably intertwined with the recommendations or advice that were being proffered.

59. Finally, communications regarding the revision to the Postal Service's Privacy Act Statement occurring on January 28, 2022, were also deliberative. This revision related to the same inquiries regarding specific information-disclosure concerns, and I worked with Mr. Marshall to ensure that the Privacy Act Statement was revised in a manner that addressed these concerns while continuing to comply with the Postal Service's disclosure obligations. These communications reflected the Law Department's thinking in the process of clarifying the Postal Service's policy as a matter of Privacy Act compliance. In doing so, they also reflected the Law Department's thinking with respect to the specific inquiries at issue—namely, contexts in which disclosures to law enforcement authorities (and, specifically, ICE) might be required. Any factual information, moreover, was inextricably intertwined with the legal advice or recommendations that were being

proffered.

60.     *Attorney-Client Privilege*: In its March 2023 Order, the Court concluded that the Postal Service had adequately shown that the attorney-client privilege applies to certain of the emails already produced to Plaintiff—namely, USPS_7–USPS_9. ECF No. 30 at 20. However, the Court determined that the Postal Service had not adequately shown that the attorney-client privilege applies to USPS_1–USPS_6. That privilege applies to portions of each of these pages, in addition to portions of USPS_10 – USPS_515 (as described in greater detail in the enclosed *Vaughn* Index, Ex. 1).

61.     First, portions of these pages have been redacted to protect confidential communications between internal clients and Postal Service attorneys and those communications incorporating attorney recommendations. These emails constitute conversations among attorneys in the Privacy and Records Management Office, which advises on the Privacy Act, including with respect to Privacy Act Statement requirements. The Court noted in its Order that the Postal Service previously referred to these emails as "aris[ing] from" communications with internal clients and that "[a]rising from a request for legal advice is not the same thing as resting on a confidential communication. For example, an abstract discussion of the Privacy Act's requirements would not necessarily reveal client communications." ECF No. 30 at 21.

62.     In this context, the Law Department was involved in the preparation of the COVID-19 test kit webform only insofar as internal clients requested legal advice. Certain of these requests are a matter of standard agency practice but no less confidential in nature—specifically, the Law Department's "Ad Review" of public-facing marketing materials and the Privacy and Records Management Office's review and advice concerning Privacy Act compliance. As the Postal Service developed the COVID-19 test kit webform, internal clients requested legal advice from

23

the Business and Finance Law group, which conducted the Ad Review (a confidential process) and answered specific questions concerning compliance in relation to the webform. As a component of this preparation process, my office responded to internal client requests by preparing the Privacy Act Statement at issue. The emails among my staff and myself also rested on confidential information from the same clients, who had described the purpose and planned contents of the COVID-19 test kit webform weeks before the site went live. Those communications informed the text that my team ultimately prepared for placement on the webform in order to comply with the Privacy Act. Accordingly, my discussions with my team occurred for the specific purpose of responding to an internal client request in the context of a confidential project (*i.e.*, the preparation of the COVID-19 test kit webform).

63.     Conversations among internal clients and Postal Service attorneys regarding the Postal Service's obligations to provide information to law enforcement authorities and the ensuing revision to the Privacy Act Statement are privileged for the same reason. Initially, members of the Government Relations and Corporate Communications groups requested confidential legal advice that would facilitate a response to Sen. Wyden's office regarding this matter. This request was legal in nature because it concerned the Postal Service's obligations under the Privacy Act. Attorneys in the Law Department drafted a response, which was circulated among internal stakeholders and subject to further deliberation before the Postal Service supplied its response. Subsequently, the Postal Service revised its Privacy Act Statement in a manner consistent with the statement issued to Sen. Wyden's office. Communications concerning this revision are similarly privileged, as they drew upon legal questions and contributions from internal clients.

**Foreseeable Harm**

64.     As to all responsive records redacted under Exemption 5, disclosing the withheld

24

information would result in foreseeable harm.

65.    *Deliberative Process Privilege*: Disclosure of material that is subject to the deliberative process privilege would result in harm in a variety of ways. In this context, the Postal Service was engaged in a substantial effort to facilitate the distribution of millions of COVID-19 test kits more than a year before the end of the Public Health Emergency in the United States.[14] This represented a particularly important, fast-moving project that required input from across the organization. Disclosure of substantive communications in this context would have particularly far-reaching consequences for the Postal Service.

66.    Broadly, disclosing substantive email communications would prevent Postal Service officials, employees, and attorneys from speaking candidly amongst each other regarding new initiatives and policy developments. Disclosure would particularly chill communications among Postal Service employees, officials, and attorneys, because their discussions about draft materials as well as legal, business, and media strategies would be revealed. Revealing internal policymaking and legal discussions would generally hinder postal officials from contacting postal attorneys for their advice and recommendations and, accordingly, prevent postal officials from making appropriate judgments on behalf of the Postal Service.

67.    Disclosure would also result in harm specific to the communications at issue in this matter. In particular, certain of the records disclosed to Plaintiff make clear that community members and leaders are concerned about unnecessary or improper disclosures of consumer information. In part, the Privacy Act serves to protect against these types of disclosures; however, because other laws require the Postal Service to disclose information in certain contexts, Privacy

---

[14] *See* U.S. Dep't of Health and Human Services, "COVID-19 Public Health Emergency" (accessed on December 9, 2024), https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html.

Act compliance—including as to the preparation of an appropriate Privacy Act Statement—often requires substantial deliberation. Correctly evaluating the Privacy Act is critical in ensuring that the Postal Service can gather the necessary information to provide its services—here, providing free COVID-19 test kits to the American public to help curb the spread of the infectious disease— and perform its functions while apprising the relevant parties of the ways their information might be used and ensuring that information is disclosed only to the extent allowed under the law. The Postal Service is especially exacting as to Privacy Act compliance in part because of the organization's role in serving the whole American public. Revealing recommendations, strategies, and legal opinions would discourage candid discussion of Privacy Act compliance issues, which would result in less rigorous legal analysis and conclusions. Incorrect evaluation of the Privacy Act would cause not only incorrect Privacy Act Statements but also improper disclosure of information.

68.    In this specific context, disclosure would also reveal internal counsel's deliberations concerning statutory compliance, along with the deliberations of high-ranking postal executives (including the Postmaster General and the General Counsel). Revealing these communications would impair the Postal Service's ability to make sound agency decisions because executives would be reticent to share their thoughts amongst one another and their legal counsel.

69.    Disclosure would also impair the Postal Service's relationship with other government entities, such as the White House. The redacted communications include those between postal employees and a White House employee, as well as those among postal employees discussing, and thereby incorporating, concerns raised by the White House. If such communications were revealed, the White House would be unlikely to engage in full and frank

26

communications with the Postal Service.[15] Such communications are necessary, as government entities make proposals and share strategies with one another to best serve the public. The COVID-19 pandemic was a particularly prominent episode requiring coordination across government agencies; while that Public Health Emergency has ended, new developments continually introduce challenges for the Federal Government, and government entities (including the Postal Service) must be positioned to communicate frankly in order to assess the needs of the public and craft appropriate interventions. Ultimately, revealing such communications would harm the Federal Government's ability to function within itself.

70.    Disclosure would also allow confidential discussions to be misconstrued by the public. Without the benefit of context, certain opinions, recommendations, and strategies would be misappropriated and misstated. In particular, disclosing portions of the emails that are not specifically deliberative in nature, but which are inextricably intertwined with the deliberative portions, would also cause harm. The Postal Service is one of many governmental entities that collect personal information and, accordingly, must comply with the Privacy Act. In part, the statute explicitly requires agencies to craft explanations of how personal information can be used, *see* 5 U.S.C. §§ 552a(e)(3)-(4), a process that inherently requires coordination among internal clients and attorneys. If disclosed, portions of these conversations might be misconstrued, whether mistakenly or purposely, in a manner that suggests the Postal Service is misusing customer information, and the American public will erroneously mistrust the Postal Service and the Federal Government and, as a result, decline in the future to request the publicly available resources from the Federal Government that are designed to address any future public health emergency. This

---

[15] Importantly, revealing correspondence with a White House staffer would discourage frank communications between the White House and the Postal Service regardless of the Presidential Administration at any given time.

27

would also place postal employees, officials, and attorneys in the position of having to defend against public confusion and distortions related to the Postal Service's information management, including as to the COVID-19 test kit webform.

71.    *Attorney-Client Privilege*: Certain identified communications consist of email communications (1) between postal attorneys and internal clients or (2) among postal attorneys. The same harm described in relation to the deliberative process privilege would also result from the disclosure of information withheld under the attorney-client privilege, with especially deleterious effects for the relationship between agency clients and internal attorneys.

72.    Here, revealing nascent attorney and internal client impressions about various iterations of the Privacy Statement, potential revisions thereto, and external concerns from the public and the White House would negatively impact the Postal Service's ability to appropriately respond to legal issues and public concerns. Exposing such communications to public scrutiny would interfere with the attorney-client relationship between postal attorneys and internal clients by impeding the sharing of candid advice that is critical to an attorney's ability to render legal advice.

73.    Disclosing such information would also reveal confidential information transmitted by internal clients and reveal the Postal Service's assessment of various legal issues implicating the Privacy Act Statement, along with its broader consideration of information disclosure obligations in relation to the Privacy Act.

74.    Disclosure in this context would also raise concerns for the candid discussion of legal matters across the spectrum, as the Law Department provided advice in this context in the same manner as it does in relation to the voluminous requests for legal advice that it receives from across an organization of more than 600,000 employees. The Law Department's Ad Review and

28

preparation of the Privacy Act Statement stemmed from typical requests for legal advice, and disclosure here would suggest that numerous other legal conversations would also be subject to disclosure. This would broadly undermine the ability of internal clients and attorneys to discuss legal questions and to reach conclusions capable of withstanding the appropriate scrutiny.

## Segregation of Non-Exempt Information

75.    The Postal Service has carefully reviewed the 519 pages of responsive records produced as a result of its searches for records responsive to Plaintiff's FOIA request, including those conducted in compliance with the Court's March 2023 Order.

76.    The Postal Service conducted a line-by-line review of the records identified to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied. The Postal Service determined that all non-exempt information was segregated and any non-exempt portions were released.

77.    The Postal Service has documented the records produced to Plaintiff, including descriptions of the Postal Service's withholdings within those records, in the Vaughn Index attached to this declaration as Exhibit 1.

*    *    *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing declaration is true and correct. Executed in Washington, D.C., on November 15, 2024.

Janine Castorina

Digitally signed by Janine Castorina
Date: 2024.12.12 16:06:24 -05'00'

Janine Castorina
Chief Privacy and Records Officer
United States Postal Service

29